| 65 | 129 |
| 65 | 155 |
| 65 | 157 |
| 65 | 161 |
| 65 | 164 |
| 65 | 165 |
| 65 | 167 |
| 65 | 168 |
| 65 | 129 |
| 66 | 551 |

LOREN DAY v. EDWARD COLE ET AL., AND LUMAN JENISON v. EDWARD H. LEONARD ET AL.[1]

*Assignment of contract for sale of lands—Forgery—Equity.*

This case is so essentially one of fact that an examination of the opinion is necessary to a proper understanding of the questions passed upon, to which reference is had.

[1] On January 25, 1889, the petition of Marland R. Gardner and Eloise A. Dodge, two of the heirs at law of Ransom Gardner, deceased, for leave to file a bill in the circuit court for Ottawa county, in chancery, to obtain a decree modifying the decree made on the hearing of *this* case, was denied, and the opinion is published with the opinion filed in *this* case, and immediately following the same.

Appeal from Ottawa.  (Arnold, J.)   Argued October 13 and 14, 1886.   Decided February 15, 1887.

Cross-bill dismissed and decree below reversed and modified so as to conform to opinion.   The facts are fully stated in the opinion.

*J. C. FitzGerald* (*Allen C. Adsit*, of counsel), for complainant, Loren Day.

*O. L. Jordan*, for defendant Gardner and others.

*Stephen L. Lowing*, for Luman Jenison, complainant in cross-bill.

MORSE, J.   The original bill in this cause was filed September 12, 1881.   It was defended by Edward Cole, Luman Jenison, Josephine M. Perkins, and Orleans L. Jordan. The bill was taken as confessed as to all the other defendants.   The original cross-bill was filed June 29, 1882.   The defendant Orleans L. Jordan appeared, and filed his answer, and the complainant replied thereto.   The bill was taken as confessed as to all the other defendants.

November 14, 1882, an order was made that proofs and hearing be taken and had on said bills and answers, and that the same be taken and heard together.   The proofs were subsequently taken.   The court, after considering the proofs, determined that the heirs at law and personal representatives of Ransom Gardner, deceased, were necessary parties.   Supplemental bills were filed for that purpose February 23, 1884. The Gardner heirs entered their appearance March 25, 1884. Answers and replications were subsequently filed, additional proofs taken, and the causes argued and submitted.

The decree of the court below is brought to this Court upon the appeal of Emma E. Underwood, Marland R. Gardner, and Orleans L. Jordan, defendants in both bills.

To more accurately define the controversy in this cause it will be best, in my opinion, first to notice the undisputed

facts in the beginning, upon which the contest of the parties
is based.

For several years prior to the ninth day of February, 1866,
Frederick B. Leonard, Thomas C. Brinsmade, and Jonathan
E. Whipple, copartners under the name of the Blendon
Lumber Company, were engaged in the lumber business in
Blendon, Ottawa county, this State. They were all residents
of Rensselaer county, New York. They owned several thou-
sand acres of pine land in Ottawa county. The title of these
lands was held in the individual names of the copartners
jointly. These lands were chiefly valuable for the timber
standing and growing thereon. This company had a saw-mill,
several miles of railroad, a locomotive engine, cars, and other
property, which were owned and used by them in their busi-
ness.

Jonathan E. Whipple, one of said firm, died at Lansing-
burg, New York, February 9, 1866. He left a last will
and testament, which was duly proved and admitted to pro-
bate. Frederick B. Leonard, of Rensselaer county, New
York, was the executor of such will. While Leonard was
acting as such executor, and on the first day of September,
1866, the said Blendon Lumber Company, through Capt.
Stephen R. Noyes, negotiated a sale of lands, including the
mill, railroad, and other property, to the defendant Edward
Cole for the sum of $27,000. Noyes, in behalf of the Blen-
don Lumber Company, and with the knowledge and consent
of Leonard (who acted for himself and the estate of Whipple)
and Brinsmade, entered into a written contract with Cole, on
the day last above mentioned, by which contract the com-
pany agreed to sell said Cole the lands and other property.
Cole was to pay $27,000 therefor, with interest at the rate of
7 per cent. per annum—$10,000 in one year, $10,000 in two
years, and the residue in three years. He was to pay monthly,
according to the amount of timber removed. He was to take
immediate possession of the premises, and pay all taxes and

assessments upon the lands thereafter. Upon the fulfillment of the contract on Cole's part he was to have a good and sufficient deed of the lands, with covenants of warranty.

Cole held, at this time, a part-paid contract for the purchase of certain lands from the Holland Harbor Board, situated in Ottawa county. This contract was originally made between the Holland Harbor Board and one John Haire, and was dated January 1, 1866. Haire assigned his interest to Cole. By the terms of the contract between the Blendon Lumber Company and Cole, the latter was to assign this contract to the former, to secure, upon Cole's part, the faithful performance of his contract with the company. Cole duly executed this assignment.

Cole also held a contract for the purchase of another lot of lands from Turner and Bostwick. This contract he assigned to one Pearsons. On the seventh of September, 1867, Cole and Pearsons jointly assigned this contract over to the Blendon Lumber Company as additional security for the performance by Cole of his contract with that company. There is no claim of invalidity as to any of these contracts, or the assignments of the same. They form the basis and groundwork of the claims of all the parties to this suit.

Cole entered at once into the possession of the property contracted to him by the Blendon Lumber Company, and engaged in lumbering on the lands mentioned in that contract, and also in the other two contracts. He ran the business in his own name, and made some payments upon the contract. August 29, 1867, Cole assigned in writing his interest in all three of these contracts to Ransom Gardner, of Kalamazoo. After that, for some time, he ran the business in Gardner's name.

The claims of the respective parties may be stated as follows:

Loren Day, the complainant, alleges that he is the owner of the entire legal title to the lands agreed to be sold by the

Blendon Lumber Company to Edward Cole. Frederick B. Leonard died February 9, 1872, and Thomas C. Brinsmade died June 22, 1868, thus leaving none of the copartners living. Leonard died last, and at the time of his death was still the executor of Whipple's will. Edward H. Leonard and Cornelia Leonard were executor and executrix of the last will of Frederick B. Leonard, and on the third day of December, 1879, Day obtained from them a deed of the lands described in the Cole contract, subject to Cole's interest therein under said contract.

Day's counsel claim that Edward H. Leonard and Cornelia Leonard, representing the estate of Frederick B. Leonard, who was the last surviving partner of the Blendon Lumber Company, conveyed by such deed to him the whole interest of such copartnership in said lands, as such lands were in fact partnership lands, and held by the company as such, although the titles to the same were held jointly in the individual names of the copartners. Day also holds the title to the lands by conveyances from the sole legatees of Frederick B. Leonard and Brinsmade, and one-fifth of the interest of Whipple through a deed from one of the five legatees of his estate, making altogether eleven-fifteenths of the whole title.

The court below rejected his claim for the whole title, but found that he owned eleven-fifteenths of the same. As Day does not appeal, it must be considered, as the case stands here, that Day is now the ostensible owner, at least, of eleven-fifteenths of whatever title the Blendon Lumber Company, or the legatees of the individuals composing the same, held at the time of his purchase.

The defendant Orleans L. Jordan owns the title of four of the legatees of Whipple, or four-fifteenths of the legal title, which the court below decreed to him. But he contends that he is the owner of Cole's interest in all three of the contracts involved here; that the Blendon Lumber Company was long ago paid in full upon the Cole contract; and

that he, as the sole assignee of Cole, is entitled to the lands, and personal property, so far as it still remains, and to Cole's interest in the Holland Harbor and Turner and Bostwick contracts.

Jordan traces his title to these lands and contracts as follows: As before stated, Cole assigned his contract to Ransom Gardner, August 29, 1867. It is claimed by the complainant, Day, and the defendant Luman Jenison, that Gardner reassigned this contract to Cole, January 4th, 1876. Jordan contends that this pretended assignment is a forgery. He claims that Gardner sold one-half of the Cole contract to one Wells, who was his partner in business. This sale was made in 1868.

In October, 1875, Gardner & Wells obtained a loan from the Cleveland Savings & Loan Association and the Cleveland Rolling Mills, and turned over to them this Cole contract as collateral security. In September, 1878, Wells settled with these parties and took back the contract. October 29, 1878, Wells assigned the contract to Jordan. Jordan claims that the contract in the hands of Gardner & Wells was copartnership property, and that Wells, at the time of the assignment to Jordan, was surviving partner of the firm, Gardner having died in June, 1876. Davis, one of the administrators of Gardner, also executed an assignment of Gardner's interest in the contract to Wells. The Gardner heirs, in their answer, claim title to the contract in Gardner as hereinbefore set forth, and that such contract has been fully paid and performed. They now claim, as his heirs, a one-half interest in such contract, subject to the equities of Wells therein as surviving partner of the firm of A. G. Wells & Co., which was composed of their father and said Wells, and to the equities of Jordan as assignee of Wells.

The complainant, Luman Jenison, in his cross-bill, claims that on the third day of June, 1882, the defendant Edward Cole, assigned his contract with the Blendon Lumber Com-

pany, and his interest in the Holland Harbor Board and Turner and Bostwick contracts, to one Stephen L. Lowing, and that said Lowing and his wife afterwards, for a good and valuable consideration, conveyed to him all the lands and premises, described in such contracts, and that, as the assignee of Cole through Lowing's deed, he is entitled, from the complainant Day, or whoever holds the legal title to the lands mentioned in the Blendon Lumber Company contract, to a conveyance of the same, and an assignment of the other two contracts. He asks for an accounting of the payments made by Cole and others upon the first named contract, and for a determination—

1. As to who are the legal owners and holders of the title to the lands described in the Blendon Lumber Company contract.

2. Who are the legal owners and holders of the title of the parties of the first part in all three of the contracts.

3. What amount has been paid upon the principal contract, and what is due, if anything, thereon.

4. That whoever holds the legal title to the lands shall be decreed to convey the same to him, the said Jenison, upon payment by him of the amount, if anything, found due and owing upon said contract by said Cole or his assignees.

Upon the pleadings and proofs the court below found and decreed, in substance—

1. That Loren Day owned eleven-fifteenths of the legal title to the Blendon Lumber Company lands, and Orleans L. Jordan four-fifteenths; that each of them acquired their respective titles with full knowledge of the contract of September 1, 1866; and that they hold such legal title in trust for Luman Jenison, subject to the payment of the money found due upon the contract and for the payment of taxes.

2. There is due said Day $10,530.29, together with interest thereon from the first day of October, 1885, for money actually and necessarily paid by him for taxes assessed upon the premises.

3. That there is due upon the said contract, over and above said amount for taxes, the sum of $19,678.94, with interest from the first day of October, 1885; eleven-fifteenths

of the same to be paid to Loren Day, and four-fifteenths to Orleans L. Jordan.

4. That Luman Jenison is the equitable owner, subject to the above payments, and entitled to the possession, of all the lands and property described in said contract of September 1, 1866, excepting one 80 heretofore sold; and that he is also the equitable owner of the Holland Harbor Board and the Turner and Bostwick contracts, and entitled to the possession of the lands described therein; that no one of the defendants, except said Jenison and the defendant Jordan, has any rights in the contract of September 1, 1866, or to the Turner and Bostwick or Holland Harbor Board lands, and that said Jenison, Day, and Jordan have no interest in the same other than as before specified in said decree; and that Jenison is entitled to have said lands, except said 80, as specified in said Blendon Lumber Company contract, assigned and conveyed to him, and to have assigned and conveyed to him the other two contracts, with all the right, title, and interest in the Blendon Lumber Company, or any person claiming under or through them, to the same, upon payment by said Jenison to the said Day and Jordan of the amounts, with interest, found to be due them.

Provision is made in the decree for the proper conveyance of such lands and contracts to said Jenison upon such payments by him to Day and Jordan, and for the sale of the property by a circuit court commissioner in case the said Jenison shall fail to pay the amounts specified to be paid to Day and Jordan, out of the proceeds of which sale their claim shall be paid, if enough is realized for that purpose. Day, Jordan, and all the other parties, except Jenison, to the suit, are perpetually enjoined from cutting timber or meddling with the property, and Jenison is also enjoined from doing the same until he shall have paid the amounts decreed to be paid to said Day and Jordan. Costs are awarded Day as against Jenison and Jordan, and in favor of Jenison as against Jordan.

The first question to be determined on this appeal, under the proofs, is the genuineness of the alleged assignment from Ransom Gardner back to Edward Cole of these contracts. If such assignment was never executed by Gardner,

and is a forgery, as claimed by the defendant Jordan, the interest of Luman Jenison disappears; and, if it is genuine, the defendant Jordan has no claim upon the lands described in said contract except his four-fifteenths of the legal title to the Blendon Lumber Company lands, subject to the equities of the holder of the vendee's interest in the contract of September 1, 1866. This assignment is dated January 4, 1876, and dated at Kalamazoo. The body of the instrument is in the handwriting of F. J. Ort, a lawyer then residing at Holland, and is signed "R. Gardner." There are no subscribing witnesses to the paper.

The evidence in support of the genuineness of Gardner's signature rests mainly upon the testimony of the defendant Edward Cole, and the similarity of the signature "R. Gardner" to others admitted to be genuine.

Cole swears that in May, 1872, Gardner orally turned over to him all the property under the Blendon Lumber Company and other contracts, and said to him, in the presence of Peter Koning and Alvah S. Norton, at Holland, that he (Gardner) had had an interview with Dr. Leonard, who represented and was one of the company, and that the doctor said the lands mentioned in the contract were paid for; that Gardner said, further, that he had been well paid by Cole for all that he had done for Cole; and that he did not wish to have anything more to do with the contract. He told Cole to hunt up the contract, and, when it was found, he would cancel Cole's assignment of the same to him; and that, as soon as he could get a settlement with the company, he would either have the lands conveyed to Cole, or take a deed, and himself convey them to Cole. Cole is corroborated as to this conversation with Gardner by the testimony of both Koning and Norton. Cole claims that, after this talk at Holland, he thereafter lumbered upon these lands, and managed the property in his own name, and that Gardner had no more to do with the business, or the lands described in the contract.

Cole testifies that he went with Ort to Kalamazoo for
the express purpose of obtaining from Gardner a written
assignment from Gardner to him of this contract; that, pre-
vious to his going there, he had procured Ort to draw an
assignment, which he had shown to Gardner; that Gardner
had suggested some alterations, which Cole promised to have
made.    They arrived at Kalamazoo about the middle of the
forenoon, but did not register or take dinner at any hotel.
Cole went from the train to the house of Gardner. - From
there he and Gardner went to the law office of Breese &
Stearns, and stayed a few moments, and from there to the
Kalamazoo House.    At the Kalamazoo House, Gardner
agreed to reassign the Blendon Lumber Company contract
to Cole, if Cole would renew certain notes and a mortgage
for the sum of $10,000 executed by said Cole to Gardner,
upon a mill and other property, May 15, 1872.    Between 11
and 12 o'clock a. m., Gardner went home to dinner.    In the
afternoon he returned to the Kalamazoo House, and there
met Cole.    Ort, in the meantime, had drawn up this assign-
ment in the sitting-room of the hotel.    Gardner signed it,
and then he and Cole went to the office of Breese & Stearns,
where Cole executed five notes and a mortgage upon said
mill property, and delivered the same to Gardner.    The prop-
erty so mortgaged was not connected with the property
involved in this suit, and the mortgage contained a clause
stating that it was in renewal of the old mortgage of May 15,
1872.    Ort was not present when Gardner signed the paper,
nor was any one save Cole and Gardner.    Cole claims it was
signed about 1 o'clock, p. m.

Evidence is introduced upon the part of the defendant
Jordan tending to show that Gardner left home before noon
of that day, and was not in Kalamazoo the remainder of the
day.

Ort, in his testimony, claims that he went to Kalamazoo
with Cole, and drew the assignment in the sitting-room of

the Kalamazoo House, as claimed by Cole, and that Cole went to Chicago, and he returned home in the afternoon. He did not see Gardner at all. A. M. Stearns, who drafted the notes and mortgage, does not remember the time of day the parties were in his office, or whether they were in there more than once or not. Thinks Gardner was going south when he came in, and had a little valise in his hand. Remembers nothing being said by either Cole or Gardner as to the assignment, or any other contract except the notes and mortgage there drawn and executed. Breese is not sworn, but his name appears as a witness to the mortgage.

Cole's conduct since the alleged execution of this assignment, and before the commencement of this suit, is at variance with his claim that the same was executed and delivered to him January 4, 1876. In 1881, in a suit between the Jenisons and A. G. Wells, he testified that in 1872 Gardner orally assigned all these lands to him, which testimony was supported in that suit, as here, by the evidence of Koning and Norton. He made no claim, at that time, of having a written assignment. It would seem that if this assignment was genuine, and executed at the date it purports, Cole would have relied upon and used it in that suit, as he was then, as now, seeking to show title to the lands under an assignment from Gardner. This suit of the Jenisons against Wells grew out of and was grounded upon an assignment by Cole of an alleged claim of his against A. G. Wells & Co., composed of Gardner and A. G. Wells, for a locomotive, other personal property, and lumber taken by Gardner from the lands mentioned in the Blendon Lumber Company contract. In 1879 he went to Kalamazoo to see Jordan, and offered his testimony and services to him in a suit which Jordan had instituted to compel a specific performance of this contract, which Jordan then, as now, claimed to own as assignee of the vendee's rights. Jordan exhibited to him the account of the Blendon Lumber Company presented against the estate of

Gardner, and Cole pointed out several items which were not correct, and as he (Cole) claimed ought not to be allowed. And in 1883, after the original bill in this cause had been filed, he wrote the following letter to Jordan:

"Zeeland, Mich., January 7, 1883.
" O. L. Jordan, Esq.,
   "Kalamazoo, Michigan

"*Dear Sir :* When will you be in Grand Haven ? I would like to see you. I can post you where parties have taken off over 100,000 M. ft. of the best timber from my original pur-chase of the Holland Harbor land. They are not sawed yet, but are in the mill-yard. If you will replevin the logs, and prosecute for trespass, I will post you and assist you in it. And I want to see you on other matters. Write me at West Olive (as I shall not be in Zeeland this week) when and where I can see you, and oblige,

"Very respectfully,
"Edward Cole."

March 24, 1881, he also wrote to Jordan as follows:

"Holland, March 24, 1881.
"O. L. Jordan, Esq.,
   "*Dear Sir :* When are you coming to Holland ? I would like to see you very much concerning this Blendon land question. Now, if you are not coming to Holland shortly, I will come to Kalamazoo and see you, if you will state what day I can meet you. Come to Holland, if you can, forthwith, as I think I can help you very much in your matter with Jenison. Please answer by return of mail when you will be here, and oblige,
"E. Cole."
" Write me at Olive Center, Ottawa county, Mich."

A. G. Wells testifies that in 1877 Cole told him that he had no claim to the lands, but that Gardner had always promised him that, if he did well with the lands, he would give him a particular 160 acres of the same; but that, Gardner being dead, he could get nothing unless Wells would give it to him. He said, if Wells would agree to give him this land, that he would assist him in any way he could in perfecting the title to the Blendon Lumber Company lands. This conversation is also testified to by Marland R. Gardner, a son of Ransom

Gardner, deceased. There are other witnesses who testify to statements made by Cole at different times after 1876, to the effect that he had no interest in the lands or property, and that the same belonged to Gardner.

There is no doubt, from his own evidence, that he made no claim to Jordan, until long after the commencement of this suit, that he had a written assignment from Gardner, and that he offered, if given some of the lands, to aid Jordan as a witness against the claim of Jenison. His evidence is so full of contradictions and confessed perjury that it is entitled to but little, if any, credence upon the subject of the validity of this assignment; and he is the only witness to its execution by Gardner.

It is also a significant circumstance that, at the time of the death of Gardner, which took place in June, 1876, and for a long time thereafter, Capt. S. R. Noyes, the agent of the survivors of the Blendon Lumber Company, and all those interested as survivors of or legatees of the individual members composing said company, supposed that Gardner, at the time of his death, and his estate after his death, or A. G. Wells as surviving partner of A. G. Wells & Co., still owned Cole's interest in said contract. If Cole's version of the retransfer to him be true, the fact that, from 1872 up to 1878 or 1879, those holding the vendors' interest in this contract received no notice from him, or anybody else, of such transfer, is very singular. It seems hardly possible that it could be so, and there is no explanation given why they were not informed of the end of Gardner's interest.

In October, 1875, Gardner assigned this contract to the Cleveland parties as collateral security for a loan obtained by A. G. Wells & Co. of them, and in November of same year he drafted an order from Cole upon the secretary of the Holland Harbor Board, authorizing him to deed the lands described in the Haire contract to Gardner, which order Cole signed without any hesitation, or any agreement with Gard-

ner for a conveyance of the lands to Cole after the receipt of such deed. This action does not tally with his testimony that Gardner had no interest in the contracts after May, 1872.

Noyes also swears that in April or May, 1876, Gardner was arranging with him to take a deed of these lands, and pay up the balance on the contract. He proposed to pay to the Blendon Lumber Company a judgment against H. & L. Jenison, which will be noted hereafter, take an assignment of the same, and collect it, if possible, from the Jenisons. This judgment amounted to about $14,000, and was, when collected, if it remained in the hands of the Blendon Lumber Company, to be applied as so much payment upon the contract. Noyes procured a deed from the heirs, running to Gardner, in pursuance of said arrangement, some 30 days afterwards, and wrote to Gardner at Kalamazoo that said deed was ready; received no answer, and in about a week wrote again, and received no answer; learned soon after that Gardner was dead.

We find Cole, Noyes, Gardner, and every one else interested in these contracts, or the property connected therewith, treating and dealing with the same as if the vendee's interest was in Gardner up to the very hour of his death, and the survivors continuing in the same direction for a long time thereafter, and up to almost the beginning of the litigation. This should and does have great weight in determining the truth as to the disputed issue of the genuineness of this alleged assignment from Gardner to Cole.

There are many other circumstances inconsistent with Cole's statement of receiving back from Gardner, in 1872, the rights of the vendee in this contract, and the property connected therewith, and antagonistic to the theory of a written assignment being executed, as claimed, in 1876. Gardner is dead. He was the only person who could deny the testimony of Cole that he saw him sign his name, "R.

"Gardner," to this instrument in the Kalamazoo House, January 4 of that year. We must therefore depend upon the facts and circumstances surrounding the parties, and their acts and the business relations existing between them, for nearly all the light in which to discover or discern the truth.

We can place no reliance upon the testimony of Cole, as his acts, in the main, up to the time of the filing of his answer, January 28, 1882, dispute the truthfulness of his evidence since given under oath. The fact that Gardner died giving and leaving no sign that he had parted with his interest in the contract, and, while living, used and acted with the contract as his own, is significant; and the fact that Cole, in his relations and business dealings with Gardner, treated the contract as belonging to Gardner, is still more significant. The two facts, put together, tend to visibly weaken and destroy the claim that this assignment is a valid and genuine document. And, in the face of these facts, with the addition that the Blendon Lumber Company, and their agent, Capt. Noyes, also understood, until some time after Gardner's death, that Gardner, and not Cole, held the vendee's interest in this contract, the testimony of various parties to conversations of a different tenor between Gardner and Cole in 1872 and 1874, and to the effect that Gardner had no further interest in the contract or the property mentioned in it, and that it was in Cole's hands again, cannot be considered of much value or weight in determining whether or not the signature to this assignment was forged. Such testimony, even if the witnesses are reliable and truthful persons, is open to the well-known imperfections of hearing, understanding, and memory, so often referred to and commented upon bv courts when discussing this kind of evidence.

"Actions speak louder than words" is an old and truthful saying; and when the words, conflicting with the actions, come to us through unreliable conductors or imperfect channels, we must give in court, as we would out of court, cre-

dence to the acts, rather than to the reported sayings, of the parties, in arriving at the truth of a disputed fact.

There were introduced, in Jenison's interest, upon the trial, several letters from Gardner to Cole. Among them is a postscript signed, "R. Gardner" (known in the record as Exhibit No. 128). Between this signature to Exhibit 128 and the signature to the alleged assignment to Cole there is a most marked and almost perfect similarity. It is claimed by the defendant Jordan that the signature to the assignment was copied from the "R. Gardner" in Exhibit 128, and that it was done in the following manner: A piece of thin paper was laid over the signature in Exhibit 128, and such signature then traced upon it by a sharp pointed instrument, and that the effect of this sharp instrument can now be seen by the aid of a glass; that this instrument broke or loosened the fiber of the paper, and was drawn along the edge of the ink lines, but in some places seems to have slipped a little one side of the line. He claims the marks of this instrument can be seen now upon this Exhibit 128. The exhibit, as examined by us since the argument, bears plain evidence of such tracing. This paper, when so traced, as he claims, was used to outline the signature upon the alleged assignment; that such outlining was made with a pencil; and he swears that he finds a very clear indication of the pencil lining under the lines made by the pen, which shows that the writing was first outlined by a pencil, and then that outline followed by the use of pen and ink. In some places he says the pen and ink have not followed accurately the lining of the penciling. Upon an examination of this signature with a magnifying glass we find indications of a pencil mark, and that the same extends perceptibly beyond the ink line at the end of the signature. All the facts testified to by him as above seem to appear upon a close inspection of the two signatures.

It is claimed by the counsel for Day and Jenison that these

exhibits have been in the possession of Jordan more or less since their admission in evidence, and that he is alone respon. le for their present appearance in these respects; that Jordan had the exhibits in Howard's office, and was seen tampering with them with a pencil. They claim that a pencil drawn over the signature after the writing in ink had been done would show the same impression that it now does. Jordan admits that he had the exhibits in Howard's office in Holland while the commissioner, Charles E. Soule, and several other persons, were in the room. He says he was satisfied that the signature to the assignment was copied from the signature attached to Exhibit 128, and, in order to make a comparison between the two, he called for some thin or tissue paper, which was handed him.

"I took and placed the thin paper over the signature to the Exhibit 100 [the assignment], and over the ink lines of that signature I drew my pencil,—not a common lead pencil making a black or dark mark, but one making a purple tinted mark. I drew this very lightly and carefully over that signature. Then I moved the tissue paper along, and placed the pencil lines directly over the ink lines to Exhibit 128, and they agreed perfectly so far as was perceptible to the eye. I then made a similar marking over the signature to Exhibit 128, drawing the pencil along so lightly as to make only a fine or faint tracing with the pencil on tissue paper."

He also testifies, as to his observation with a misroscope, that wherever the traced lines of the sharp instrument, seen on Exhibit 128, vary from the lines of the pen of that signature, the variance corresponds exactly with the signature to the assignment. Upon experiment it will be found that a traced copy of either one of these signatures fits almost exactly the other signature, and, if there is any variance at all, it is occasioned by the tracing slipping to one side of the ink line, as shown in Exhibit No. 128, or the inaccurate following of the pencil line by the pen and ink in the signature to the alleged assignment. At least the marks of the sharp instrument, admitted by the counsel for Jenison in his brief

now to be seen on Exhibit 128, seem to correspond exactly with the pencil line, also admitted by the same counsel to be apparent in the signature to the assignment. For instance, the pencil line in that signature is not followed to its end by the ink, and such signature is just so much shorter than the signature to Exhibit 128 as is the length of pencil space not followed by the ink in the assignment. It must be admitted that the theory of the defendant is a most plausible and likely one upon an examination of the two signatures.

It may be that he, or some one else not interested against him, has had opportunity to make these sharp instrument marks upon Exhibit No. 128 since this suit has been in process; and it could have been done as well at one time as another; but it is extremely doubtful if the pencil marks or lining shown in the signature to the assignment could have been made after the pen and ink writing was done, and left the appearance now shown by that paper. The body of the assignment is admitted to be in Ort's handwriting, and the general testimony of the experts is to the effect that the body of the instrument and the signature were both written with the same pen and with the same ink. This, however, is too much a matter of speculation to be relied upon. It appears, however, that Ort was once charged with being concerned in a forgery, and one witness swears that he once explained to such witness how a name might be forged, and in such explanation, gave nearly, if not quite, the same method as is here claimed to have been used.

I am satisfied the signature is a forgery. All the facts seem to point in that direction; but the one thing that fastens conviction upon my mind above all others is this: these two signatures are too evenly alike to be both genuine. As before said, the tracing of one fits so accurately to the other as to show no perceptible difference, except in length, to the naked eye. This difference is accounted for by the pencil lining. Several signatures, "R. Gardner," admitted to be

genuine, are in the case. A tracing of no one of these fits anywhere near any other; nor will a tracing of the assignment signature, or of the one in Exhibit 128, cover any of them. It does not seem hardly possible that one, without design, can write his name twice so exactly alike, in spaces between and height of the letters, and their slope or angles, as that a tracing of one will accurately measure the other in every respect. Indeed, numerous experiments show that it cannot be done when it is sought to be done. Such a perfect coincidence as in the case of these two signatures in this cause is at least highly improbable, and but barely possible, if attainable at all.

There is in my mind but one explanation for this remarkable and striking similarity; and that is that, while Exhibit 128 was in the hands of Cole, this signature to the assignment was copied and manufactured therefrom by some one. And I am satisfied that it was done by tracing and outlining, so that virtually, with some slight inaccuracies, the signature upon 128 was transferred to the assignment. There is too much method shown in the latter signature, and the method has exposed, to my mind, that it is not the genuine signature of a business man, like Gardner, writing in a hurry, and without thought of the manner of making or the form of such signature, but the cunning imitation of a forger, whose cunning has yet been the means of detecting the forgery.

I am also satisfied that the contract between the Blendon Lumber Company and Cole was fully paid up before the death of Gardner. It is not necessary to state in full the reasons for this finding; but a few leading facts may be referred to as aiding in such conclusion.

When Gardner obtained Cole's interest in these contracts, he made an agreement as to the payment of the balance then due upon the main contract of September 1, 1866. At this time a suit was pending between the Blendon Lumber Company and H. & L. Jenison, of which firm the defendant

Luman Jenison was a member. While parties under Cole had been lumbering on these lands, the Jenisons, claiming under a chattel mortgage from Cole, had replevied a large amount of lumber from the possession of the Blendon Lumber Company. As this lumber had been turned out to the company as a payment on the contract, it was agreed that the amount realized by the company from such suit with the Jenisons, if any, should be credited upon the contract. Judgment was recovered by the Blendon Lumber Company against the Jenisons, September 24, 1872, for the sum of $17,133. A motion for new trial was made in the United States court for the western district of Michigan, upon which motion it was ordered by that court, November 23, 1872, that a new trial be granted unless the Blendon Lumber Company would remit all of said judgment in excess of $11,461. This remittal was made the same day in open court, and judgment entered for the last named sum. This judgment was collected some four years thereafter, but only $11,547.06 was credited upon the contract, an attorney fee of $2,500 paid being deducted from the amount collected.

The last payment made by Gardner, or in his behalf, upon this contract, exclusive of this judgment, was made May 4, 1870, by five time drafts of $1,800 each, the last of which was paid November 4, 1870. After the payment above specified, the Blendon Lumber Company, or their agent, Capt. Noyes, made no demands for further payment upon Gardner, or any one else, until after Gardner's death, while, before this payment in 1870, the payments were sharply looked after and promptly demanded. We shall not go into any computation; but it is evident that enough, with the judgment collection against the Jenisons, has been paid upon the contract to more than meet the principal and all the interest due upon it, as well as the advances made by the company to parties operating the business under Cole before his assignment to Gardner.

Cole testifies that Gardner told him, at the time he alleges Gardner turned the property over to him, in 1872, that Dr. Leonard had admitted to Gardner that the lands were paid for, and that the final settlement with the company would probably be delayed because of the death of Brinsmade. Cole and Gardner, it seems from all the evidence, understood that there was nothing due upon the contract for three or four years prior to Gardner's decease. It would appear that Noyes also so understood it.

After final judgment against the Jenisons, an execution levy was made upon certain lands owned by them. December 13, 1875, Noyes wrote from Lansingburg, New York, to Gardner, offering, on behalf of the company, to discount the judgment 10 per cent. if Gardner would take it and pay the money to them for it. In this letter he makes no intimation whatever of any claim of a balance due them upon the contract. Soon after the death of Gardner, Noyes wrote to O. L. Jordan that there was a small balance due upon this contract. This letter was written August 9, 1876. The judgment collection against the Jenisons was not credited upon the contract until August 22, 1876. Noyes writes:

"As there is a small part of the purchase money yet due, being informed that you represent the estate in some way, I have taken the liberty to address you. We are desirous to close up the matter and give deeds as soon as convenient."

August 18, 1876, he again writes that he expects to receive soon several thousand dollars upon the Jenison judgment, and, as soon as that is done, promises to render full statement of the account. He says further, in this letter, that the final settlement with Gardner had been delayed on account of this judgment. These letters, and his actions in regard to the matter from 1870 up to that time, cannot well be reconciled with the statement of account afterwards presented by him in behalf of the company against Gardner's

estate, or the claim of balance due made by him on the trial
of this cause.

Nor has his subsequent conduct been in keeping with such
claim. Although the estate of Gardner may have been insol-
vent, and a claim against him therefore worthless, the Blen-
don Lumber Company yet held, without dispute, the vendors'
interest in said contract, and the lands and property men-
tioned therein were ample security for the balance due
them upon the same. When Jordan opened negotiations to
purchase the interest of the Blendon Lumber Company, the
business was all transacted through Noyes as their agent;
and an agreement was made by which the interest of such
company was to be purchased for the sum of $3,500, $1,000
to be paid to each of the estates of the three deceased co-
partners, and $500 to Noyes. A deed was made by all the
heirs to Jordan in pursuance of this agreement, and assign-
ments were also executed to him of two mortgages upon other
lands, known as the "Gibbs mortgages," which mortgages
were worth nearly, if not quite, the sum to be paid by Jor-
dan. The deed and mortgage assignments were never deliv-
ered to Jordan, probably because of Day's purchase. Day
only paid, according to his own story, $3,200 for the assign-
ment of these contracts, and he also, for the same sum, re-
ceived an assignment of one Gibbs mortgage, upon which he
testifies there was over $3,000 unpaid at the time he received
such assignment. The Gibbs mortgage was undoubtedly
worth the sum paid, so that in fact the assignment of the con-
tracts cost him but little, if anything. This disposition of
their interest in these contracts, therefore, tends very strongly
to confirm the theory that the contract was fully paid be-
fore Gardner's death. ·

It appears very conclusively from the record that the com-
plainant, Loren Day is only the ostensible owner of the inter-
est claimed by him. He borrowed the money to make this
purchase of the defendant Luman Jenison, and has acted in

his interest throughout. He is owing Jenison over $40,000, and was in debt to him for that amount at the time he purchased the vendors' interest in these contracts. Though apparently having opposite sides in both bills, Day making Jenison a defendant in the original and being made by Jenison a defendant in the cross-bill, their causes are really managed by the same attorneys, and a perusal of the record at once shows their interests to be really the same and identical except in name. Since he acquired the interest he now holds in this contract of September 1, 1866, he has bought a large number of tax titles upon the lands mentioned in these contracts, of Luman Jenison, and others holding the same in their names in Jenison's interest. He has also given to Jenison a mortgage upon the lands for all they are worth to secure his indebtedness to him. He also claims, through his attorneys, to have paid taxes upon the lands since he purchased the contract. As the contract expressly provided that the vendee should pay the taxes, he claims that he should be reimbursed for the same by the party now holding the vendee's interest. The amount allowed him for taxes in the court below was based upon this claim.

The conclusion that I arrive at, upon a careful study of the record in this case, is this: Day, the complainant, owns eleven-fifteenths of the vendors' interest in this contract, and O. L. Jordan four-fifteenths; that Luman Jenison, the assignment from Gardner to Cole being a forgery, has no interest in these contracts save what he may have in the title ostensibly held by Day; that O. L. Jordan is the owner of the vendee's interest in said contracts, and that said contract of September 1, 1866, is fully paid up except a claim for taxes; that he is entitled to a conveyance from the complainant, Day, of all the lands described in the said contract, excepting the 80 heretofore mentioned, and an assignment from Day of his interest in the Holland Harbor Board and Turner and Bostwick contracts, upon payment to said Day of

the amount of the taxes which he or his grantors have right-fully paid upon said lands for taxes assessed and levied during the existence of said contract of September 1, 1866.

The cross-bill of said Luman Jenison will therefore be dismissed, with costs of both courts to the defendants Jordan, Underwood, and Gardner. The decree of the court below will be reversed in part, and modified so as to conform to the views herein expressed.

In relation to the taxes, we do not find from the proofs that Day has paid any taxes. His claim rests upon tax titles and tax bids acquired by himself and others. Those purchased by others he now holds by assignment. He has submitted the tax deeds and tax bids to the court, not as an assertion of title under them, but claiming a reimbursement for the money expended because of the vendee's obligation in the Cole contract to pay them. He does not show that he has paid any particular sum of money for them, but he has agreed to pay Luman Jenison $15,000 therefor.

It seems that, immediately after Gardner's death, Jenison, through his attorneys and other friends, began bidding these lands off for taxes, with a view, no doubt, of further complicating the title in Jenison's interest. He, instead of Day, is the real owner of all these titles. It is difficult, under the circumstances, to do complete equity in the premises. A great fraud has been attempted in this case, and Jenison has been the moving spirit in it. It is noticeable that he does not appear as a witness in the case, although his interest seems to be the only real one adverse to the defendant Jordan. Day is only a man of straw set up by Jenison to better conceal the real intent and purport of the scheme to acquire these lands.

We appreciate the legal and equitable obligation of the vendees to pay the taxes upon these lands; but, considering the long course of vexatious and unwarranted litigation in this matter, the possession of a part of the lands by Jenison

for some time, and the numerous trespasses upon it by him and others acting under his direction, we are not disposed to extend the equities in his favor beyond the strict letter of his rights under these tax titles. If we could, from the record, accurately measure the value of the timber that Jenison and his agents have taken off these lands, we have not much doubt but that it would offset the amount he has paid for taxes. But we cannot do this from the proofs, as they are defective in this respect. Had Jenison been a witness in his own behalf, the result might have been different. As it is, we find the tax levies for 1873 wholly void; the supervisor's certificate of assessment not complying with the law.

We also find that Jenison took possession of these lands in the winter of 1878 and 1879, under tax titles previously acquired, and lumbered upon the lands, claiming to own them, and that he told the supervisor in the spring of 1879 to assess them to him as he owned them. He was therefore not in a position to purchase and hold the tax titles for the year 1879. The tax levies upon these lands were extraordinary and it seems to us unusual, and since Jenison set about obtaining the title to them the tax levies have been higher than before, while the value of the lands was decreasing as the timber upon them was being diminished. We shall not, therefore, allow anything for the taxes of 1873, 1878, or 1879.

We shall allow the amount for the other years, as near as may be, without interest, and without the expenses of advertisement and sale. This amount we find to be the sum of $5,399.09. This amount the defendant Jordan shall pay or tender to the complainant, Day, less the amount of his taxed costs in both courts against both Day and Jenison. And upon such payment or tender the said Day shall convey, by suitable and proper deed, all his title to all of said lands, including his title under said tax deeds and bids, as well as under said contracts and deeds of the legatees of the Blendon Lumber Company. In case he shall refuse or neglect to make

such conveyance, the decree to be drawn and entered in this Court shall operate as such a conveyance. The defendant Jordan will recover his costs against the complainant, Day, in both courts. No other parties shall recover costs except as herein provided.

CAMPBELL, C. J., and SHERWOOD, J., concurred. CHAMP-LIN, J., did not sit.