Porter's Estate.

Argued March 26, 1941.   Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*W. Brown Higbee,* with him *Eugene C. Sloan* and *F. B. Olsen,* for appellants.

*Dean D. Sturgis,* with him *Linn V. Phillips,* for appellees.

OPINION BY MR. JUSTICE MAXEY, April 14, 1941:

This is an appeal from the dismissal by the Orphans' Court of Fayette County of a petition for an issue devisavit vel non. Newell Armstrong Porter, Sr., died on October 9, 1940, aged 84 years, leaving a personal estate of $145,979.60 and real estate valued at $11,000. His only heirs at law were a brother, C. R. Porter, a niece, Mary Porter Wyatt, and six children of Mary Louise Stewart, a deceased sister. Decedent's wife died in 1913 and they had no children. In October, 1940, Linn V. Phillips, Esq., counsel for Earl Huston, presented for probate to the Register of Wills of Fayette County a paper purported to be the will of decedent. Huston was a beneficiary named in the challenged will and was therein named executor. The paper consisted of three typewritten pages, the first two of which are each signed at the bottom on a typewritten line the name of Newell Armstrong Porter, Sr. The third page being about one-half filled with testamentary provisions is signed after the clause appointing Earl Huston the executor. It is followed by the testimonium clause, and it is again signed on a typewritten line "Newell Armstrong Porter, Sr." John W. Rankin and George C. Steele were subscribing witnesses to this will. It gives nothing to the heirs at law and bequeaths $35,000, free of all taxes, to the executor, Earl Huston, and cancels his indebtedness amounting to $5,000 and bequeaths to Mrs. Verna McCrory, testator's housekeeper, $50,000.00, free of all taxes, and numerous articles of personal property. The real estate and residuary estate is devised and bequeathed to P. R. Luce, son-in-law to Mrs. McCrory. The will bears a typewritten date of July 17, 1937. Attorney Phillips testified that the will was prepared by him about ten days prior to its date.

The only reasons filed in support of the caveat which we need consider here are these: "That the writing was procured by fraud, undue influence, duress, constraint and contrivance exerted by Earl Huston, Verna

McCrory, and P. R. Luce, beneficiaries thereunder, and others. Said paper writing is not the last will and testament of Newell Armstrong Porter, Sr., deceased." Contestants mean by this last assertion that Porter's alleged signatures on the "paper writing" are forgeries.

A hearing was held by the register on November 7, 1940. The will was probated without taking contestants' testimony. Probate was revoked and the record certified to the Orphans' Court.

At the trial a transcript of the testimony of the subscribing witnesses before the register was received in evidence, pursuant to the respective counsels' agreement. John W. Rankin, one of the subscribing witnesses, testified that he was then, and for nine years had been, a County Commissioner of Fayette County and that he knew Newell Armstrong Porter, Sr., "very well". He testified that Mr. Porter signed the will and then he at Porter's request signed it "after him." Rankin identified his own signature to the paper. All this signing was done in the presence of George Steele, the other subscribing witness, in the conference room of the commissioners' office. He said that Porter "had the paper with him when he came to my office but I did not see what it was." No one else was present when the paper was thus executed and witnessed. He identified the two signatures on page 3 as the two names he saw the decedent write. He does not remember whether he saw Porter sign pages 1 and 2. The other subscribing witness, George Steel, gave testimony substantially like that of Mr. Rankin and differing only in inconsequential details. He identified his own signature and that of the decedent. He said that he had known Mr. Porter for 50 years.

The contestants offered exhibits consisting of photographs and transparencies showing (so they claim) that two genuine signatures of testator on an application filed in the Register's office in 1932 had normal differences in their length, spacing, width of the letters, height

of the letters, and angles and alignment, but that *one* of these signatures and *all four of the signatures on the will* itself were *identical* in these respects, thus indicating, they argued, that the four signatures on the will had been traced from an admittedly genuine signature of the decedent. Contestants also presented evidence which they argued supported the charge of undue influence.

As the court below pointed out, there is no evidence of testator's testamentary incapacity and "a substantial part" of the testimony in support of the charge of undue influence in making the will consists of the testimony of the three principal beneficiaries of the will, Mrs. McCrory, P. R. Luce, and Earl Huston, who were all called "as if under cross-examination." The contestants showed friendly and even intimate relations between the three chief beneficiaries of the will and Mr. Porter, but while such relations may provide opportunities for undue influence they do not prove its exercise. Porter lived in close domiciliary association with Mr. and Mrs. McCrory for many years before Mr. McCrory's death in 1933. For a long time they lived in the same apartment, which belonged to Porter. For 22 years Mrs. McCrory furnished Porter with all his meals. Porter charged no rental for the apartment and he paid nothing directly for his meals. Mrs. McCrory married a man named Sturgis on July 3, 1937, but continued to be called by Porter and many others as Mrs. McCrory. She was divorced from Sturgis on November 10, 1939. Porter made from time to time gifts to Mrs. McCrory, some of these gifts being checks for $100.00. In October 1936 Porter contributed $600.00 to the purchase of a Plymouth car for her and in 1939 he contributed $1,600.00 to the purchase of a Packard car for her. He also gave her diamond jewelry and a $1,000 postal savings bond.

Porter and Earl Huston, another beneficiary, were directors of the same bank in Brownsville until it closed

in 1931. He frequently consulted Huston (who later became chief clerk in the county commissioners' office) about his (Porter's) business affairs and loaned money to Huston. The latter prepared Porter's personal property tax returns and was co-administrator with him in the settlement of the estate of Porter's sister. Porter promised to take care of him in his will and gave him instructions as to his funeral and place of burial.

P. R. Luce, another beneficiary of the will, married Mrs. McCrory's daughter in 1920. He worked for Porter for 20 years irregularly on Porter's farm and after 1937 he worked regularly on the farm for $100.00 a month, giving up all other employment. The court below regarded the will in question as a "natural one" for Porter to make. The court found that Porter had not been on friendly terms with his brother and that there was "no close association between him and his nieces, all of whom were born and have always resided in the middle west."

The court below correctly held that the contestants had failed to establish the charge of "undue influence" used on the testator in making his will, as this court has defined that phrase in *Phillips' Est.*, 244 Pa. 35, 90 A. 457, and in many other cases.

To prove the charge that the signatures on the alleged will are forgeries, contestants called two handwriting experts who made comparisons of the disputed signatures with admittedly genuine signatures of the decedent. They claimed that the signatures on the testamentary paper were made by tracing. They described the technique employed as the "use of a light under a genuine signature, one sheet at a time being placed over some genuine signature and the outline made." The second expert witness testified that "there is an unusual similarity between the four signatures on the reputed will." He added: "We have here the signature of a man who is reputed to be over eighty years of age at the time this signature was made. In each signa-

ture the characteristics are carried out to almost exactly from a fractional point of an inch and each measurement bearing the exact measurement in—for example, the first letter is capital N." He also said that the signatures showed "a sense of uniformity of writing, showed definite signs of premeditation, extensive planning and scheming and not the result of a mere chance. . . . Now I will take the last word 'Porter, Sr.' We find again the capital P exactly the same size, o-r, space t, then the e-r and the Sr. All the Sr.'s are crowded in almost exactly the same measurements."

As against the opinion of the two expert witnesses that the signatures to the will are forgeries, we have the testimony of the two apparently disinterested subscribing witnesses, who say they saw the testator sign his name. Their testimony was neither contradicted nor discredited except by implication in the testimony of the handwriting experts. There was also the testimony of eight laymen who said they were familiar with the testator's handwriting and that the signatures in question were genuine. An examination of the four questioned signatures shows that they are remarkably similar in size and form though they are not "identical with each other and with a genuine signature of Porter" (contestants' exhibit No. 11), as appellants assert in their paper book. For example, the letters "r" in the last half of the name "Armstrong" are not alike in the four signatures. The loop of the letter "A" in "Armstrong" in the last signature differs from the corresponding loop elsewhere in the signatures. There is also a slight difference in the lengths of the four signatures. In *Com. v. Snyder et al.*, 123 Pa. Superior Ct. 523, 187 A. 254, cited by the appellants, the signatures adjudged *in that case* to be forged, "when superimposed on the other corresponded in every detail." This is not true of the questioned signatures here.

The court below said: "The evidence of the expert witnesses is persuasive, but in view of the undisputed

direct evidence, it is not convincing. Contestants assert that the evidence of forgery is more than the mere opinion of the witnesses; that it is a mathematical demonstration that the general formation of the letters, the height, the slant, the spacing, and in short, everything about them, is so nearly identical in all four signatures that they could not be genuine: *Com. v. Snyder,* 123 Pa. Superior Ct. 523, 187 A. 254; *Stitzel v. Miller,* 250 Ill. 72, 95 N. E. 53; *Day v. Cole,* 65 Mich. 129, 31 N. W. 823. . . . Notwithstanding these physical facts tending to show companionship in the signatures, the direct evidence is so weighty that we could not sustain a finding against it."

In conclusion the court below cites the case of *Caughey v. Bridenbaugh,* 208 Pa. 414, 57 A. 1134, in which this court in a Per Curiam opinion affirmed the judgment of the court below in an opinion by Judge ENDLICH of the Court of Common Pleas of Berks County, that opinion being published in full. In his opinion Judge ENDLICH said: "In every case tried before a jury in which the trial judge sits as a chancellor, the evidence is addressed to him quite as much as to the jury—must as a whole be judged of by him independently of the jury—must satisfy his conscience as well as the jury —and cannot be rightfully submitted to the jury as the basis of any finding which he would not approve; in a word, he cannot permit the jury to do what he, as a chancellor, would not do: *Rowand v. Finney,* 96 Pa. 192; *Reno v. Moss,* 120 Pa. 49 [13 A. 716]."

Appellants in their paper book cite *DeLaurentiis's Est.,* 323 Pa. 70, 186 A. 359, and *Phillips' Est.,* 244 Pa. 35, 90 A. 457, in support of their contention that the issue should have been submitted to a jury. In the first named case this court said: "In *McWilliams's Est.,* 259 Pa. 526, 532, [103 A. 365], the rule was stated to be that expert testimony of this kind cannot be received as independent testimony but only 'as corroborating other direct or positive evidence as to some fact in is-

sue.' This is more satisfactorily expressed in *Henry's Est.*, 276 Pa. 511, 513 [120 A. 454], where it is said that: 'The trial court based its refusal of this issue upon the ground that the opinion evidence, *standing alone*, as it did, would not sustain a finding of forgery, in the face of the direct and credible evidence. This accords with our decisions. . . . Were the direct evidence discredited, or the opinion evidence strengthened by facts and circumstances, the case might be different.' "

In the Phillips case, supra, which also arose from a petition for an issue devisavit vel non, this court said: "An issue devisavit vel non is a matter of right . . . when upon a review of all the proofs a verdict against the will could be properly sustained by a trial judge, . . . even though the judge should feel that were he sitting as a juror he would not draw the inferences or reach the conclusions contended for by the contestants. But if the testimony is such that the judge would feel constrained to set aside a verdict against the will as contrary to the manifest weight of the evidence, determined according to relevant legal standards, it cannot be said that a substantial dispute has arisen. [Citing cases.] The 'absolute right of the parties' to a trial by jury depends upon 'the strength of their evidence,' and to determine that, on an application for an issue, the Orphans' Court must hear and weigh the proofs as a whole."

The court below in the instant case followed the rule laid down in the cases just cited. The testimony of the handwriting experts in this case would not be sufficient to sustain a verdict against the will in the light of the uncontradicted and unimpeached testimony of the subscribing witnesses to this will.

The decree is affirmed at appellants' cost.