## Elias Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*Joseph Matusow* and *Samuel J. Marks*, for exceptants.

*David Weinstein*, contra.

SAYLOR, J., June 9, 1967.—Anna Elias Calza, a sister, and Thomas John Elias, a brother of decedent, filed exceptions to the opinion and decree of Burke, J., sustaining an appeal from the action of the register of wills in refusing to admit to probate the will of William John Elias by which he bequeathed his estate to his sister, Mary Rebecca Elias Dugdale, and his brother, Samuel John Elias.

It had been alleged by exceptants, in their caveat filed with the register, that there had been fraud and undue influence practiced upon decedent, and in a later supplemental caveat they alleged forgery. The record of the hearing on petition and answer contains testimony relating to testamentary capacity and undue influence. In his opinion, Judge Burke stated that

he found as a fact decedent possessed testamentary capacity and also that the will had not been procured by undue influence.

The hearing judge also found as a fact that the contested document was executed by decedent. The exceptions before the court relate to burden of proof and charge appellants from the register's refusal to probate the will with failing to meet the requirements of section 4 of the Wills Act of April 24, 1947, P. L. 89, as amended by the Act of February 17, 1956, P. L. (1955) 1070, in that the testimony of the subscribing witnesses was so impeached, perjured and discredited as to render them incompetent as subscribing witnesses.

Hence, the sole issue to be determined is that of forgery. Exceptants' counsel so avers in his brief and so stated to the court en banc at argument.

At the hearing, the two attesting witnesses testified that they had both been present when the will was executed on March 9, 1965; that they saw decedent sign his name in three places, at the foot of both the first and second pages and at the end of the will, and that they, in turn, signed as witnesses. They identified the signatures as those of decedent, each witness having on previous occasions seen his signature on other papers and thus being familiar with it.

One of the subscribing witnesses was Mary Rebecca Elias Dugdale, decedent's sister and a legatee, who had worked with him in his oriental rug and objects of art business which he conducted in the same building where he lived. She too lived there with her daughter.

The other subscribing witness was Alvin M. Chanin, a member of the bar, who had known decedent for eight years but had not served previously as his counsel, although he did perform other legal services for him after the will was executed.

Mrs. Dugdale testified that she had heard decedent and the scrivener conversing together and that she had a vague idea that her brother was talking about a will, but she did not know what the terms were. Moreover, she did not have any discussion with the scrivener concerning the will, nor did she see it before he brought it to decedent for execution. As to identifying his signature, she said that frequently she wrote the body of many checks for her brother at his request, but that he always signed them, and, hence, she was quite familiar with his signature.

Mr. Chanin, the scrivener, testified that he was a personal friend of decedent, had been, on various occasions, at his place of business, and in the fore part of 1965 had received a telephone call from him during which he was asked to prepare a will. The terms thereof were set forth by the scrivener on sheets of yellow paper, several of which he produced at the hearing. They show notes made by the scrivener, on the basis of which he made a draft of the will. Other sheets of notes he had made were not produced, as he believed he had destroyed them following execution of the will.

Mr. Chanin testified further that immediately prior to the affixing of the various signatures to the will, decedent examined it and presumably read it. Its contents were discussed with decedent, who seemed to understand them. He was at the time of execution of sound mind and capable of handling his financial affairs. This was corroborated by Mrs. Dugdale.

Following its execution on March 9, 1965, the scrivener gave decedent a copy of the will but kept the original and took it to his office. As the date had not been inserted at the time of execution, the scrivener's secretary on that day or the next wrote in the correct date. Thereafter, the will was retained by the scrivener until April 12, 1965, when he produced it

for the attempted probate which followed on May 29, 1965. Delay was due in part to the scrivener's absence and also because he considered he had a lien on the will as he had not been paid for writing it and hoped to be employed by the executor in handling the estate. He had to be subpoenaed to appear before the register as an attesting witness.

The scrivener testified also that he had represented Mrs. Dugdale in a domestic relations court matter, but had not discussed with her decedent's will nor divulged to her any of the provisions thereof. Nor had he any conversation with her concerning the paragraph of the will whereby decedent disinherited the brother and the sister who are the exceptants.

It was this testimony of the two attesting witnesses, one of them the scrivener, a member of the bar, which in their exceptions the disinherited brother and sister of decedent described as "impeached, perjured and discredited". A careful reading of the record reveals the total absence of any basis or justification for a statement so extreme and so unfair. The testimony constitutes direct and credible evidence that there was no forgery.

True it is, in testifying these witnesses were not precise in everything they said respecting minor details, such as escape the memory of most individuals with the passage of time. That these matters were of great concern to exceptants, and stressed to an inordinate degree by them, does not derogate from the validity and essential truthfulness of the testimony concerned.

Nor does the charge of bias have an adverse effect on the testimony of Mr. Chanin. He was clearly a disinterested witness because, while he wrote the will, he had been denied any right to represent the estate. He had for a time withheld delivery of the will. He could justifiably be considered a hostile witness.

Mrs. Dugdale is, of course, interested, as she is the beneficiary of a substantial part of the estate. Nevertheless, her testimony is clear and forthright as to the execution of the will and is corroborative of what the professional witness, the scrivener, reported as to what took place at decedent's home when, the will having been delivered to him and its contents discussed with him by his attorney, decedent executed it. It is not within the realm of probability that Mr. Chanin, a young member of the bar, would commit perjury, in a matter of such great import in the life of an attorney, to favor Mrs. Dugdale or her brother at the risk of his professional reputation and career.

With the testimony of these two witnesses in the record, the proponents of the will met the requirements of the law and sustained the burden of proof placed upon them.

The will is a natural one. What is more likely than that decedent would favor with his bounty the sister who for many years had assisted him in the operation of his business and with her daughter had lived in his house? So, too, the other heir, the brother Samuel, who was close to decedent, an assistant in his business, and enjoyed his companionship and affection. On the other hand, the disinherited brother and sister had not, for years, participated in decedent's life nor shown any interest in or concern for him while he lived. Their treatment of him had long since alienated them.

The will reflects decedent's disposition to deny to his sister Anna and his brother Thomas any participation whatsoever in his estate following his death. The scrivener was specifically instructed by decedent to include in his will a provision that these two siblings should be disinherited.

A niece, Mary Dugdale, who identified the signatures of her uncle, decedent, testified that he had told her, not only during the last years of decedent's

life but at times during many preceding years, that he did not desire Anna and Thomas to receive anything from him.

Emma Miele, who knew decedent from 1948 on and saw him once a week, said that he had told her that they would never get a penny of his estate. She had witnessed many arguments between them and decedent.

John W. Bowles, who knew decedent since boyhood, testified that he was hostile to that sister and that brother and had said they were never to get a penny from him.

Margaret Mette, who had known decedent since 1943, testified that he loathed Anna and had no respect for Thomas. All of these witnesses are disinterested.

Dr. Ernani DiMassa, physician in attendance on decedent in his terminal illness followed by death on March 29, 1965, after his leg had been amputated on March 22, testified that he had known his patient for 15 to 20 years, had seen him daily in the hospital and had talked to him about the will which Mr. Chanin had written for him. He testified specifically on decedent's concern that his desire to disinherit the sister and the brother whom he disliked should prevail, and that he was determined that they should never participate in his estate.

Those who knew decedent and testified on these matters were unanimous in their statements that decedent had a mind of his own, knew what he wanted, was "master of his own ship", was mentally sound, coherent and aware of time and place until his death.

On the basis of this testimony concerning decedent's character and directions and the undisputed facts relating to the preparation and execution of the will, the hearing judge was fully justified in his finding that the will was executed by decedent. The record abundantly supports him.

The burden of going forward with the evidence of forgery then shifted to exceptants. In support of their position that the signatures to the three-page will were forgeries, they produced a qualified handwriting expert, Paul A. Osborn, who testified that he had examined various signatures of decedent on checks and other papers. Counsel for the contestants agreed that the signature "W. J. Elias" written on the authorization for the surgeon for operation on decedent's leg and dated March 22, 1965, was signed by him and could be considered a standard signature. The signatures on checks dated December 31, 1964, January 6 and 11, 1965, conformed, except that there was a difference in the "line quality" between them and the signature on the authorization. But this witness said that the signatures on three checks dated March 15, 1965, were not the same and, in his opinion, were probably not signed by decedent, and they resembled the signatures to the will. It cannot be said that he precisely and distinctly testified that the latter were forgeries. This testimony did not constitute clear, concise evidence as to forgery.

In commenting on the testimony of this expert, the hearing judge said in his opinion that from it exceptants argue that the physical condition of decedent on March 15, 1965, precluded his signing the checks, and since decedent did not sign the checks, and the will signatures coinciding with those on the checks, ergo, the will was forged. On the contrary, Mrs. Dugdale had testified that decedent did sign the three checks dated March 15, 1965, before he went to the hospital.

Exceptants also called Lucy Gureghian, an old friend of decedent, who testified that a week or two weeks before he went to the hospital decedent was lying on a couch and appeared to be in pain, although he was responsive to conversation, alert as in previous years, rational and sharp, and competent to make decisions.

In rebuttal, appellants produced another handwriting expert, Jacque P. Whaumbush, who testified as to the standards employed in making a comparison of signatures and stated that he had examined the standard and the other signatures of decedent. He concluded that the signatures on the checks dated December 31, 1964, January 6 and January 11, 1965, admittedly genuine, conform to the three signatures on the will and that on the authorization form and were made by the same person. He stated that a variation in "line quality" appearing on the authorization form was due to the position of decedent and his physical condition when at the hospital on March 22, 1965, he executed that form by writing "W. J. Elias".

The hearing judge found as a fact that the testimony of Mr. Osborn was equivocal and that after giving the maximum weight to his testimony as compared with that of Mr. Whaumbush, the latter would prevail. In any case, as stated by the hearing judge, "as a matter of law the testimony of handwriting experts is given little weight and cannot predominate against direct factual credible evidence": Kadilak Will, 405 Pa. 238 (1961) ; Porter's Estate, 341 Pa. 476 (1941) ; Snedeker Estate, 368 Pa. 607 (1951).

There appears to have been no abuse of discretion or any fundamental error on the part of the hearing judge in applying the correct principles of law.

The will is a natural one. It was executed by decedent and attested by two witnesses, one a member of the bar who was the scrivener, and the decree directing its probate as the last will and testament of decedent is fully supported by the evidence in the record.

The exceptions are dismissed and the opinion and decree of the hearing judge are affirmed.

## DISSENTING OPINION

SHOYER, J., June 9, 1967.—The issue is forgery. Such was the finding of the register of wills, and

the sole issue before the learned hearing judge as clearly defined by the pleadings. One might well search a lifetime before finding an eyewitness to its actual perpetration. Of necessity, therefore, strange and unusual circumstances can add up to something more than mere suspicion in proof of such a charge.

Here the vague, evasive and contradictory testimony of the subscribing witnesses was insufficient to excuse the delay of two months in presenting the will for probate. One witness was the lawyer scrivener. The other was decedent's sister who was named as executrix and a principal beneficiary, and was admittedly a client of the lawyer.

The register found their testimony inconsistent (1) as to the precise time the will was prepared and executed, and (2) as to the mental attitude of decedent on the evening of the alleged execution. The record does not reveal that their testimony was materially strengthened before the hearing judge. The physical evidence of the power of attorney presented to the bank on the day of decedent's death points to a subsidiary forgery which was not disproved by the vague and indefinite testimony of the sister or by anyone else.

A most extraordinary feature of this case is the striking similarity between the handwriting of decedent and his sister, who over many years worked very closely with him in business. Both wrote in bold, black lines. His writing is large and masculine. Hers is reduced in size but more even and regular than her brother's. She frequently signed her maiden name, Elias, instead of Dugdale. Her penmanship exhibits perfect control. As evaluated by an expert: "It is beautiful penmanship. The formation of the letters, the slant, spacing between the letters, it shows an ability that is far superior to the average writer".

To successfully imitate the signature of another, the forger must have superior writing ability, and the occa-

sion for practice and imitation which their long close association gave to the sister of decedent in this case.

While I did not have the same opportunity of appraising the testimony given from the witness stand as did my learned colleague, nevertheless, I find that truth here is vigorously proclaimed by signatum ipsa loquitur rather than by a mere ipse dixit. See Fleming's Estate, 265 Pa. 399; Lare Will, 352 Pa. 323 (four opinions).

There is evidence that this testamentary disposition was natural under the circumstances. Like my colleagues, I would like to uphold its validity, and probably would if the issue were but undue influence, and not forgery. The experience gained in 11 years of examining questioned signatures as a registration commissioner, however, will not permit me to close my eyes to clear, physical evidence of forgery.

Hence, I dissent.