## Dugacki Will.

Argued January 10, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

144

*Russell C. Mauch,* with him *Milton J. Goodman* and *Mauch & Goodman,* for appellant.

*Lewis R. Long,* with him *Justin Di Jirolanio,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, March 24, 1947:

Two appeals have been taken. One is from the judgment of the court of common pleas on the verdict of a jury setting aside a will in an issue *devisavit vel non* and from the refusal of the court to enter judgment for proponent *non obstante veredicto.* The other is from the decree of the orphans' court, filed pursuant to the certification of the judgment of the common pleas, sustaining the appeal from the register of wills, setting aside the probate and authorizing the register to issue letters of administration.

Joseph Dugacki, the decedent, died June 25, 1940, unmarried and without issue, leaving to survive him as next of kin brothers, sisters and issue of a deceased brother. A paper purporting to be the will of decedent was probated. It was dated June 24, 1940, and by its terms bequeathed the entire estate to Frank Klingner, a stranger to his blood. An appeal by a brother from the probate was perfected. A petition by two of the brothers for a citation directed to the proponent of the will and all next of kin was granted by the orphans' court, to show cause why the appeal should not be sus-

tained and an issue d. v. n. be awarded to the common pleas to determine the following questions: "(1) Whether or not at the time of execution of said writing, the decedent was a person of sound mind; (2) Whether or not the said writing was procured by undue influence, duress and constraint practiced upon the said decedent Joseph Dugacki by Frank Klingner and others; (3) Whether or not the said Frank Klingner practiced or used any fraud on the decedent or the legal heirs of the decedent at the time he procured the said writing; (4) Whether or not the said writing is the will of said decedent." An answer was filed by proponent, a hearing had, and by an opinion and decree, an issue was awarded to the court of common pleas to determine: (1) whether or not, at the time of the execution of the writing alleged to be a will dated June 24, 1940, Joseph Dugacki possessed testamentary capacity, and (2) whether or not the said writing was procured by undue influence, duress, constraint or fraud practiced upon the said decedent by proponent, Frank Klingner, and others. No appeal was taken from the award of the issue.

Upon the trial of the issue in the court of common pleas the jury found (1) at the time of the writing alleged to be a will dated June 24, 1940, decedent did not possess testamentary capacity and (2) that the writing was procured by undue influence, duress, constraint or fraud practiced upon decedent by proponent and others. Motions for new trial and for judgment for proponent n. o. v. were dismissed in an exhaustive opinion by the court en banc. A decree was entered sustaining the verdict, which was certified to the orphans' court. On the same day the orphans' court entered its decree sustaining the appeal from the register. The two appeals to this Court followed.

The pivotal question is whether there is sufficient testimony to support the verdict. Our review of the testimony convinces us that the verdict is amply supported.

Decedent at the date of death was 67 years of age; his estate is said to approximate $20,000; he came from

Yugoslavia, and was a Croatian; he was able to speak
Croatian and Slavish, but could not read or write; he
spoke a few words in English which were extremely
difficult to understand; he was, however, able to sign
his name in English; he was a laborer and had worked
in the Bethlehem Steel Works at Bethlehem, Pennsylvania; for some years prior to his decease he was the
owner of a piece of land on Main Street in Hellertown,
Pennsylvania; upon the premises was erected a small
dwelling house and a barn; he left his employment in
the steel mill and except for the occasional cutting of
grass for neighbors did no work for hire; he rented
the house, reserving therein for himself a bedroom on
the second floor; he slept in his room during the winter
months, but slept in the barn during the summer time;
he was extremely frugal and dressed in old patched
garments; there was located next door to his premises
a factory operated by the Edison-Splitdorf Corporation;
Frank W. Klingner, the proponent, 33 years of age,
was the sales manager of the corporation and was the
son of the general manager of the plant; decedent called
the proponent "Mr. Boss"; the only contact between
decedent and proponent was that decedent was given
permission to obtain water from the boiler room of the
plant for use in his garden and for his cow and two
pigs (which livestock was sold by decedent in his lifetime); proponent saw decedent practically every day at
the factory when he came for water, but before decedent
became ill in June, 1940, had only visited him but
once in 1933; beyond such neighborly status there appears to have been no relationship existing between
them, socially or otherwise.

On Sunday, June 23, 1940, proponent came to decedent's barn and found him ill, lying on hay in an abandoned cow stall; later in the day proponent sought out
and found proponent's friend, Dr. Low, a physician, and
brought the doctor with him to visit the decedent professionally; the physician was 32 years of age and had been
practicing medicine for less than a year; the physician

had not known decedent nor had he ever seen him before; he found decedent on the floor of the cow stall covered with a blanket and overcoat; he made examinations and diagnosed the case as "myocardial enlargement and degeneration, pulmonary congestion, edema of the legs, and an auricular fibrillation"; he found decedent in a stupor and with dopiness and general depression; he advised decedent to go to the hospital, but decedent refused to go; on the following day (Monday) around 5 or 5.30 p. m. the doctor again visited decedent, with proponent, and found decedent still on the floor of the cow stall where he had been the day before; the doctor again advised decedent to go to the hospital, but decedent again refused; the doctor testified that decedent said "me want Mr. Boss have everything." The doctor said that in order to induce decedent to go to the hospital, he agreed to draw a paper and decedent said "all right"; the doctor then went back to his office, accompanied by proponent who then left the office. At about 9 p. m. proponent returned to the doctor's office, and the physician typed the questioned document which read as follows:

"June, 24, 1940.
Northampton Co.
Hellertown, Pa.

On this 24th day of June, nineteen hundred and forty (1940), I, Joseph Godoski (Drubich) being of sound mind and body do hereby give, devise, and bequeath all my property real, personal, and mixed to Frank Klingner of Hellertown, Pennsylvania.
Signed. . . ."

During the preparation of the paper proponent called Mr. Mauch (counsel for proponent) on the telephone and the doctor talked to the attorney and received instructions from him concerning the wording of the paper he was preparing; after the paper was typed the doctor telephoned Dr. Jones, a dentist, a social friend of both the proponent and the physician, and requested him to

go with them to the decedent for the purpose of witnessing a will; the proponent, with the proposed will in his pocket, drove the physician and dentist to decedent's barn, arriving there, in darkness, around 10 p. m.; the barn was unlighted, the sole illumination being the doctor's pocket flashlight slightly thicker than a fountain pen. With decedent, they were the only persons in the barn. What happened thereafter was testified to by the physician, the dentist and proponent who are in substantial agreement. It was testified that the physician again requested decedent to go to the hospital, but decedent refused unless he signed a paper which gave "Mr. Boss" [proponent] everything; proponent then took the paper out of his pocket and said to decedent "you sign this paper and that gives me what you want me to have;" the physician then raised decedent up from the floor of the cow stall, placed the paper on a pad of prescription blanks, put the flashlight beam on the paper, handed decedent a fountain pen and decedent signed his name to the will; after the signature was affixed, the physician signed as a witness, as did Dr. Jones, the dentist; the executed document was handed to proponent, who then wrote the word *"seal"* after decedent's signature, and kept the document in his possession until its probate; it was testified that after the completion of the execution decedent gave his consent to go to the hospital, where he was taken by the proponent and the doctor, and was admitted at 11.17 p. m. The decedent died the next day, approximately 23 hours after his admission.

There is ample testimony to support the verdict of the jury that the decedent did not possess testamentary capacity when he signed the paper purporting to be his will. We have repeatedly defined what constitutes testamentary capacity. A person is of sound mind and disposing memory when he has a full and intelligent knowledge of the act that he is engaged in, a full knowledge of the property he posessses, and an intelligent

perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty: *Wilson v. Mitchell,* 101 Pa. 495; *Snyder's Estate,* 279 Pa. 63, 123 A. 663; *Olshefski's Estate,* 337 Pa. 420, 11 A. 2d 487; *Ash Will,* 351 Pa. 317, 41 A. 2d 620. As early as 1612 Coke said: "Few men pinched with the messengers of death have a disposing memory": 10 Rep. Pref. XIV. According to the physician, who was the scrivener, at the time decedent signed the paper he was desperately ill; death was imminent; his only possible chance to survive was to be treated in the hospital; when the paper was signed decedent was in a stupor and generally depressed; the alleged instructions for making the will were most vague and indefinite; there was no indication that decedent possessed a full and intelligent knowledge that he was making a *will,* or what property he possessed, or that he had an intelligent perception and understanding of the disposition he desired to make of his property. There was no proof that the scrivener, the witness or the proponent made the slightest inquiries of the decedent concerning such matters. The paper which was prepared and signed was neither read nor explained to decedent. Decedent was in such a debilitated physical and mental condition that the jury could fairly find that he did not possess testamentary capacity and was incapable of properly understanding the nature of his act and the purport of the paper which he signed.

We are also convinced that the testimony fully supported the second finding of the jury that the writing was procured by undue influence, duress, constraint or fraud practiced upon decedent by proponent. The most that was proved concerning the relations between decedent and proponent was the friendship of neighbors. Proponent never transacted any business for decedent, nor were they ever socially intimate. With the decedent in the physical and mental state hereinbefore stated, the physician scrivener who had never before known or

seen decedent, wrote the will, in proponent's presence, was advised by the scrivener's attorney as to wording, and with the proponent in company with another friend called as a witness, went to the darkened barn, and with the aid of a small flashlight secured decedent's signature to the paper. To assure himself as to the legality of the paper, the proponent, after the execution, and the signature of testator, at that time or at a later date, added a circle and wrote therein the word "seal". It is true that the scrivener, the witness and proponent all testified that decedent said he wanted "Mr. Boss" [proponent] to have everything, and declined to go to the hospital until such a paper was signed; in all the suspicious surrounding circumstances, the question of undue influence and fraud was clearly for the jury: *Cookson's Estate,* 325 Pa. 81, 188 A. 904; *Buhan v. Keslar,* 328 Pa. 312, 194 A. 917; *Olshefski's Estate,* 337 Pa. 420, 11 A. 2d 487; *Shuey v. Shuey,* 340 Pa. 27, 16 A. 2d 4. See also cases cited by Judge HUNTER in his Pennsylvania Orphans' Court Common Place Book, vol. 1, p. 222 et seq. We have considered the effect of proponent's addition of a seal to the paper after its execution, and have concluded that this was an immaterial alteration which did not otherwise affect the validity of the will: *Grubbs v. McDonald,* 91 Pa. 236. Such fact, however, may be considered as one of the elements tending to establish proponent's effort to secure a *valid* will in his favor.

The burden rested upon the proponent at all times to sustain the will: *Szmahl's Estate,* 335 Pa. 89, 6 A. 2d 267. While in the first instance he met the burden by offering in evidence the record of probate, yet upon contestant's evidence of sufficient quality the burden passed to proponent. We have well defined this procedure: *Keen's Estate,* 299 Pa. 430, 149 A. 737; *Plotts' Estate,* 335 Pa. 81, 5 A. 2d 901; *Szmahl's Estate,* supra; *Ash Will,* 351 Pa. 317, 321, et seq., 41 A. 2d 620. The correct procedure was followed both in the orphans' court and in the court of common pleas.

When an issue d. v. n. is awarded, a verdict by a jury where properly sustained by the court of common pleas, is conclusive and binding on the orphans' court: *Cross's Estate*, 278 Pa. 170, 122 A. 267; *Lare Will*, 352 Pa. 323, 334, 42 A. 2d 801. While it was premature for the common pleas to have certified its judgment to the orphans' court before the time for appeal to this Court had expired, and which necessitated an appeal from the orphans' court decree made in pursuance thereto, no harm has resulted.

The appeal (in No. 37) from the judgment of the court of common pleas is dismissed and the judgment is affirmed. The appeal (in No. 36) from the decree of the orphans' court is dismissed and the decree affirmed at the cost of appellant.