## Boyd Estate.

Argued November 24, 1950. Before HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ. (RHODES, P. J., absent).

*J. I. Simon,* for appellant.

*Thomas E. Barton,* with him *Oliver L. Johnson,* for appellee.

OPINION BY RENO, J., January 12, 1951:

George Boyd died on April 18, 1946, and by his will dated February 21, 1946, and admitted to probate after a contest before the register, divided his estate equally between "Annie Jamison, my beloved niece and Martha Tyson, friend." By a prior will dated December 27, 1945, he divided his estate between "my niece Annie Jamison . . . and Thomas George Williams, now a minor." Thomas is a son of Laura Williams, whose claim as the common law wife of testator was rejected in *Jamison v. Williams*, 164 Pa. Superior Ct. 344, 64 A. 2d 857. After that decision, Laura Williams, as the mother and natural guardian of Thomas, appealed from the probate. The hearing judge and, upon exceptions, the court in banc dismissed her appeal, and she brought the case here.

Before the register contestant contended solely that the decedent lacked testamentary capacity. In the court below and here she asserted that testator had weakened mentally and that the terms of his last will resulted from undue influence exerted by Martha Tyson who stood in a confidential relation with him. Contestant does not question Boyd's testamentary capacity, and proponents concede that his mind had become weak. Contestant sought to show a confidential relation between him and Martha Tyson, and thereby cast upon proponents the burden of showing that Boyd was free from undue influence, relying upon *Quein Will*, 361 Pa. 133, 62 A. 2d 909. The court below found that the alleged confidential relation did not exist; that Martha Tyson, in fact, exerted no undue influence upon the testator; and that the evidence did not disclose the existence of a substantial and material dispute of fact.

On appeal, the findings of fact of the court below are entitled to great consideration, *Masho's Est.*, 303 Pa. 56, 153 A. 899, especially where the case depends upon the testimony of witnesses whose credibility must

be weighed and passed upon. *Lowe's Est.*, 318 Pa. 497, 178 A. 820. We read the testimony to determine whether the findings are supported by the evidence, but we do not retry the case de novo. *Pusey's Est.*, 321 Pa. 248, 184 A. 844. The question for us to decide is not whether this Court would have reached the same result had it been sitting as chancellor, but rather whether a judicial mind, on due consideration of the evidence as a whole, could reasonably have reached the conclusion of the chancellor; in other words, the decision of the court below will not be reversed unless an abuse of discretion on its part appears. *Dible's Estate*, 316 Pa. 553, 175 A. 538.

It may be set down at once that Boyd had deteriorated mentally and physically, and yet he possessed testamentary competency. He was 48 years old at his death, and for many years had been a Pullman porter. Sometime in September, 1945, a group of white soldiers threw him from a moving train or else he jumped from it because of their threats. He suffered a head injury, never returned to work, and developed a "psychosis possibly secondary to injury", as one physician diagnosed it. Apparently, "he feared white people in general and white soldiers in particular", so Judge RYAN found. Some medical men found him subject to a "fear complex" or "a persecution complex", and others who attended him from time to time found him irrational, nervous, and "out of his mind." The day before his death he cut his wrists with a razor, and he came to his death by either jumping or falling out of a window in the house where he lived with contestant.

He was a patient in the Allegheny General Hospital from November 3 to November 20, 1945, and for a month or six weeks, commencing December 22, 1945, he was an inmate in a rest home. While in the latter institution he executed his first will which was written for him by a capable and reputable attorney, Richard

F. Jones, Esq., who then found him mentally normal. (Contestant contends that this first will is a valid testamentary document.) The second will was executed after he had left the rest home in the office of another reputable attorney who found him in full possession of his mental faculties.

Martha Tyson was his fiancee. They had been friends since 1937, and became engaged during the winter of 1944-5. Until his accident they saw each other infrequently, probably because his work took him out of town for long periods. After the accident she saw him more often; visited him daily at the hospital; and was called out to see him at night when he was seized with his "sick spells" in the homes of friends. She seems to have been a capable woman; she was the proprietor of a bake shop; but she never transacted any business for him. A Mr. Goodman was, so contestant herself testified, Boyd's "business manager". He had charge of Boyd's business papers, and drew the lease which became the foundation of the action in *Jamison v. Williams,* supra. It was he who brought Boyd's Christmas gift of $50 to Miss Tyson. There is no testimony that Boyd and Miss Tyson advised each other concerning their property or financial affairs or that they relied upon each other in respect to such matters. They had no business transactions of any kind between them or in which both were interested. Apart from the status created by their engagement there is no testimony upon which could be predicated a finding of a confidential relation between them, and that status does not of itself furnish the base for a finding. *Royer's Estate,* 339 Pa. 423, 12 A. 2d 923; *Leedom v. Palmer,* 274 Pa. 22, 117 A. 410. Absent a confidential relation and present only testator's weakened mentality, the burden of proof did not shift to proponents, and contestant was obliged to show as a fact that Miss Tyson

was instrumental in having Boyd execute his will in her favor. *Quein Will,* supra.

There is no testimony that Miss Tyson exerted undue influence to procure the execution of the contested will, although she did have a remote and innocent connection with its drafting and execution. On the morning of February 21, 1946, Boyd called on Miss Tyson at her place of business and told her that he had made a will (referring to the will made in the rest home) which he wished to change. He asked her to telephone to Oliver L. Johnson, Esq., and have him secure the will from the office of Mr. Jones. As an alternative he suggested that he would give her $1,000 out of his bank account, which she refused, telling him that "if he wanted to change the will that was his business." She arranged an appointment for him with Mr. Johnson and accompanied him to the attorney's office. Mr. Johnson was also her attorney. Whether Boyd knew that fact does not appear, but there is testimony that an investigator for the Pullman Company had highly recommended Mr. Johnson to Boyd during November, 1945. At the Johnson office, Boyd was ushered into the private office where Mr. Johnson personally interviewed him alone behind closed doors, Miss Tyson remaining in the reception room. The testator had exact knowledge of his property, and was clear as to the persons who should be the recipients of his bounty. Miss Tyson did not participate in any way in the making of the will and did not discuss its contents with Mr. Johnson before or after it was executed. The will was executed by Boyd in his own handwriting and was witnessed by Mr. Johnson's secretary and an attorney practicing in the same office suite. This is the central episode upon which contestant has erected her case. It is apparent that it contains none of the elements of undue influence. There is no proof of over-

mastering influence, no unfair advantage, no imprisonment of mind or body, no fraud or threats or misrepresentations or circumstances of inordinate flattery, or physical or moral coercion. Boyd's mind, although weakened, had not been prejudiced by anything Miss Tyson said or did, his free agency was unimpaired, and nothing operated as a present restraint upon him in the making of his will. *Shuey v. Shuey*, 340 Pa. 27, 16 A. 2d 4.

In the 340 pages of testimony there is additional evidence upon which contestant relies, a great deal irrelevant and some incredible, but in totality it amounts only to what her counsel in the concluding lines of his brief calls "suspicious circumstances". Indubitably, undue influence may be established by circumstantial evidence, *Quein Will,* supra, but a finding cannot rest upon mere conjecture and suspicion. *Ash Will,* 351 Pa. 317, 41 A. 2d 620. To prove the existence of a substantial and material dispute of fact, justifying the framing of an issue, contestant was required to furnish evidence which would be sufficient to sustain a verdict against the will. *Porter's Estate,* 341 Pa. 476, 19 A. 2d 731. This she failed to supply, and the court below properly dismissed her appeal.

Decree affirmed at appellant's costs.