Simon Will.

Argued March 18, 1955. Before STERN, C. J., STEARNE, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*John M. Gallagher,* with him *Michael A. Wolak,* for appellants.

*Drayton Heard,* with him *Heard & Heard,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, April 18, 1955:

The appeals are from a decree of the Orphans' Court of Allegheny County dismissing proponents' motions for judgment *non obstante veredicto* or for a new trial following a verdict of a jury, in a consolidated trial of two issues *devisavit vel non,* which set aside and invalidated a probated will and declared invalid a later dated will offered for probate. The special verdict found that both wills had been obtained by proponents from decedent through undue influence, duress and con-

straint, and that neither will had been prepared by or at the direction of decedent, nor had they been signed by her.

Rose Simon, the decedent, a widow, over eighty years of age, died July 7, 1949, without issue, leaving surviving as her sole next of kin a sister, Marie Svobodova, the contestant, a resident of Czechoslovakia. The proponents are Mara Cieslak and her husband, John Cieslak. The sister-contestant and also proponent, John Cieslak, died during this litigation and their personal representatives have been substituted. The value of the estate is estimated at $40,000. The jury trial was held in the Orphans' Court, authorized by the Orphans' Court Act of August 10, 1951, P. L. 1163, sec. 746, 20 PS 2080.746. The trial was conducted by President Judge BOYLE with care and acumen. It required six days to try. The printed record constitutes over 775 pages and exhibits.

Since the testimony in this protracted contest has been so exhaustively and scrupulously considered by the trial Judge and by all the Judges of the learned court below, we will not again recite the facts in their minutiae.

Decedent was an aged, illiterate Croatian. She understood little English—"just a word here and there". Witnesses testified as to her inability to read, write and understand the English language. Apparently she could sign her name. Decedent lived alone in a rented apartment. It appeared that decedent and her sister, the contestant, remained on friendly terms. Proponents, the Cieslaks, were undertakers. It was testified that at or prior to 1943 Charles C. Cieslak, a brother of proponent, John Cieslak, had been in the undertaking business and had conducted the funeral of decedent's husband. While the questioned wills described proponents as "life long friends" the record is

silent as to the length or exact nature of such friendship.

Contestant charged the proponents, particularly Mara Cieslak, with chicanery, trickery and fraud in securing from decedent a will or wills whereby contestant was disinherited and proponents were devised and bequeathed decedent's entire estate. Proof of such charges included direct testimony and much circumstantial evidence. We are required to review the record in order to determine whether or not there was sufficient evidence to support the findings of the jury and whether the correct principles of law were properly applied in the court below.

Four papers or purported wills are involved in this contest. All are interrelated. The first is an unexecuted carbon copy of a will dated "—— day of July, 1943". The original of this will, which is missing and not therefore produced, was prepared by a reputable Pittsburgh attorney, and was stated to have been executed by decedent. Ordinarily such a document would possess no evidential value. However, contestant alleges that the language in this copy of will, except for a bequest of $100 to a friend and changes of residuary beneficiaries, is similar to that in the three questioned alleged wills. It is to be observed that had the execution of the 1943 will been established, decedent's funeral would have been directed to be conducted by *Charles* C. Cieslak (brother of a proponent) at $1,000 expense and in the manner described. The residue would have passed one-half to contestant (decedent's sister) and the remaining one-half to the sister's three children. A trust company was named as executor.

All three remaining alleged wills bear the purported signature of decedent. All three are identical in their dispositive provisions. The alleged testamentary direction is that proponent, M. J. Cieslak (wife of pro-

ponent John) shall conduct the funeral at the expenditure of $2,000 and in addition supply flowers in the amount of $100 and arrange for Masses. The residue of the estate is devised and bequeathed to proponents who are named executors. The alleged wills may be indicated as follows: Paper No. 1 (exhibit C) is dated December 2, 1948, and is *not witnessed*. The validity of this instrument is *not in issue*. No proof of execution has been made. Proponents have not offered it for probate. Paper No. 2, in dispositive terms, is identical with preceding paper, exhibit C. It is dated December 7, 1948, purported to be signed by decedent and witnessed by Adam Belajac and George J. Kochka. It was probated July 12, 1949. Both witnesses swore that they ". . . were present and did see and hear [decedent] . . . sign, seal, publish and declare the same as and for her last Will and Testament. . . ." Proponent, Mara Cieslak, testified that at the purported execution of the paper, one of the witnesses, George Kochka, did not see the decedent or Adam Belajac, the other witness, sign the instrument; and further, there is no testimony that decedent did or could have seen the witnesses sign so that her direction might be implied. See Wills Act of April 24, 1947, P. L. 89, sec. 4, 20 PS 180.4 requiring proof by two competent witnesses.

Whether because of the above recited infirmity in execution, or because as Mara Cieslak, proponent, at *first* testified that the above No. 1 and No. 2 papers had been lost, the last, or No. 3, will was produced by proponents and is in evidence. John Cieslak, the other proponent (husband of Mara Cieslak), petitioned the Orphans' Court to open the probate of the No. 2 will, above referred to, so that No. 3, the later will, dated May 31, 1949 (identical in dispositive terms with No. 1 and No. 2 wills), and purported to be signed by decedent and witnessed by Kathryn Spangler and Wil-

liam Wiemert, could be probated. While these two witnesses testified that they saw decedent sign the will in their presence and in the presence of each other, there is testimony in the record that the witness was unable to describe the person whose will she had witnessed. There was also testimony that, at the date of this paper, decedent was ill at her home and hence could not have been at the proponents' funeral establishment where, it was testified, the paper had been executed. Furthermore, a duly qualified handwriting expert testified that the purported signature of decedent on this paper is a forgery. It was testified that the decedent's purported signature had been drawn or traced from or over the signature appearing on No. 1 will (neither probated nor offered for probate).

It is noted that the scrivener of the first and third wills has not been disclosed. Mara Cieslak testified that the first will was signed by decedent at proponents' funeral home, but it was not witnessed and proponent did not know who wrote it. Proponent testified that she told decedent that this will was invalid because it was unwitnessed. There is testimony that proponent, Mara Cieslak, went alone to a public stenographer and had her prepare the No. 2 will (which was probated) and which was executed as recited. Proponent testified that *decedent* believed wills No. 1 and No. 2 had been lost and that decedent came to her with No. 3 will which was executed as narrated.

There are many suspicious circumstances which raise questions of fact for determination by a jury. The testimony of proponent, Mara Cieslak, concerning the "lost and found" first and second wills is indeed questionable. Proponent admitted that she had inserted dates in two of the wills, one by typewriter and the other by hand.

In summary, a tangled web has indeed been woven which required a verdict of a jury: Decedent, an old, illiterate Croatian, unable to read, write or understand the English language, addicted to the use of intoxicating liquor, and with a confidential relationship existing between her and proponents, for no disclosed or assigned reason, is supposed to have disinherited her sister and to have passed her modest estate to undertakers (proponents) who were successors to the husband-proponent's brother, an undertaker who buried decedent's husband. Proponents' testimony and that of their witnesses concerning the preparation and execution of the three wills is far from convincing and is clearly a matter for determination by a jury. President Judge BOYLE's charge of sixty printed pages, and his clear and comprehensive opinion of twenty-two printed pages, unanimously adopted by the court below, are so complete that we need not further elaborate upon the facts.

While at first it may appear unusual to consolidate in one trial two separate issues *devisavit vel non,* under the peculiar circumstances in this case this was an eminently proper method of procedure. The wills involved are interrelated, the sole difference being the dates and executions. The learned court below cited in support of this procedure: *Hoxworth v. Miller,* 7 Pa. 458; *Carter's Estate,* 2 Dist. 578 (Judge PENROSE) ; 2 Page on Wills, 3rd Ed., sec. 601. See also *Lillard v. Tolliver,* 154 Tenn. 304, 285 S. W. 576; *Est. of Thompson,* 185 Cal. 763, 198 P. 795; *Sweeney's Estate,* 248 Wis. 607, 22 N. W. 2d 657. Ordinarily two issues *devisavit vel non* should not be disposed of in one trial. It is only where the issues are closely interrelated and the parties involved are identical, as in the present case, that such procedure may be adopted.

Proponents assign seven reasons why the decree of the court below sustaining the jury's verdict against the wills should be reversed. The first reason is, in effect, that the *No. 3 will* of May 31, 1949, should be admitted to probate since the jury found the decedent possessed testamentary capacity. But this finding of the jury did not overcome the testimony that decedent was absent on the date and at the place when the will was alleged to have been executed. Even more important is the handwriting expert's testimony that the signature of decedent to the will is a forgery.

The jury found that both wills had been procured by "undue influence, duress and constraint" of proponents. As pointed out in the court's opinion such confidential relationship was established because when decedent wished to purchase a home she accepted Mara Cieslak's advice, who twice took decedent to a real estate broker's office and procured an attorney for her, handled her money at times and acted as her agent in proposed real estate transactions; decedent also frequently left papers in her possession. That a confidential relationship did exist is amply sustained by the testimony.

Because there is testimony by proponents' witnesses, declarations by decedent that she was going to execute her No. 3 will, and that decedent was actually present on May 31, 1949, at the place where the paper was said to have been executed, it is contended that the testimony of the two subscribing witnesses must be accepted as conclusive proof of decedent's execution of the will. This overlooks the testimony that upon the date of the purported execution decedent was at home ill, that the signature appearing upon the paper was forged, and that proponents inserted the date in the paper. Coupled with other testimony of fraud, the question was for a jury and the evidence supported its findings.

Proponents contend that the opinion of the handwriting expert falls in face of direct testimony of attesting witnesses as to execution. But this contention overlooks the fact that in this case the opinion of the expert does *not* stand alone. There is testimony of fraud and that decedent was not present when her signature and that of the witnesses were affixed. The opinion of the expert was, therefore, a matter for consideration by the jury. What was said in *Porter's Estate*, 341 Pa. 476, 19 A. 2d 731; *Ray v. Philadelphia*, 344 Pa. 439, 441, 442, 25 A. 2d 145; and *Peterman Will*, 367 Pa. 302, 80 A. 2d 792, applies only where such opinion testimony stands *alone*.

The sixth question of proponents having to do with advice of counsel relative to obeying subpoena and the last and seventh question relative to propriety of the court directing a verdict for proponents in connection with the No. 2 will of December 7, 1948, are so obviously devoid of merit that a discussion is unnecessary.

When will No. 2 was probated, proponents met the *initial* burden of proof. The procedure in will contests is set forth in detail in *Keen's Estate*, 299 Pa. 430, 149 A. 737; *Plotts' Estate*, 335 Pa. 81, 5 A. 2d 901; and *Szmahl's Estate*, 335 Pa. 89, 6 A. 2d 267. Our Chief Justice STERN (then Justice) accurately stated in *Szmahl's Estate*, supra (p. 93) : ". . . The acceptance in evidence of the probate merely shifts to contestants temporarily the duty to come forward with evidence, but the proceeding remains at all times a hearing de novo. It is not uncommon in legal procedure for an ultimate burden of proof to rest upon one party throughout, but for the burden of coming forward with evidence to pass back and forth from one side to the other. If no testimony is offered other than the probate of the will itself, the legal result obviously should be, as the court below decided in the present case, that

the probate is not impeached and must be accepted as conclusive, just as if there had been no appeal. . . ."

When, therefore, fraud and deceit are specifically charged and contestant produces evidence which questions the validity of the execution of the two wills at issue, and thus raises a question of fact, it is proper to submit the matter to a jury.

We have examined this record and read the testimony with care. It amply supports the verdict. We find no error in the trial and disposition of the case by the learned court below.

The decree is affirmed at the cost of appellants.