Kerr *v.* O'Donovan, Appellant.

616

Argued March 26, 1957. Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

*Samuel J. Feigus,* with him *Harrison & Louik,* for appellant.

*Henry R. Beeson,* with him *Donald M. Higbee* and *Higbee, Lewellyn & Beeson,* for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, June 28, 1957:

This appeal in a will contest raises two principal questions: whether the court below erred (1) in withdrawing the question of undue influence from consideration by the jury and (2) in refusing a new trial after a jury verdict finding that the deceased had testamentary capacity.

Agnes O. Duncan, whose will is the subject of this controversy, died January 1, 1951, aged 62 years, at Connellsville State Hospital, Fayette County, Pennsylvania. Decedent—a widow whose husband predeceased her on November 28, 1950—left to survive her, as those entitled to take from her under the Intestate Laws, two brothers, three nieces and six nephews, of the latter of whom proponent was one.

For several years prior to her death the decedent was seriously ill, afflicted with a heart condition accompanied by hardening of the arteries and edema or dropsy. On Monday, November 27, 1950, her condition became so serious that, at the direction of her attending physician, she was removed from her home at Little Summit, Fayette County, to the Frick Memorial Hos-

pital at Mt. Pleasant where she remained until December 22, 1950. During most of that time she was a very seriously ill woman. From December 22, 1950, until December 31, 1950, she stayed at her home and then removed to the Connellsville State Hospital, where she died shortly after admission.

On the day following her initial removal to the hospital decedent's husband, Patrick Duncan, while visiting her at the hospital, died very suddenly.

After decedent's death a written instrument purporting to be her last will and testament was presented for probate and probated by the Register of Wills of Fayette County on January 5, 1951. Letters testamentary thereon were granted to Donald H. Kerr, executor. This written instrument, *handwritten throughout*, reads as follows:

"November 29, 1950
Mt. Pleasant, Pa.

"I, Agnes O. Duncan,
being of sound and disposing mind, do hereby revoke any and all prior wills made by me and direct that all my property is devised and bequeathed as follows:

"1. My funeral expenses and just debts are to be paid

"2. The entire residue of all my property, both real and personal, I leave to my nephew, Donald H. Kerr.

,

,

,

,

,_____

"Donald H. Kerr, my nephew, is to be my sole executor

/s/ Agnes O. Duncan

"Attest:

/s/ Eleanor E. Roland   /s/ Francis E. Holahan
1141 S. Pittsburgh St.   R. D. #1, Dunbar, Pa.
Connellsville, Pa.       /s/ Mrs. Eva Pfrogner
                         212 Silver St.
                         Mt. Pleasant, Pa."[1]

On December 11, 1952, Clarence F. O'Donovan, brother of decedent, filed an appeal from the probate of said will requesting an issue on the questions of undue influence and testamentary capacity.

On August 12, 1953, the court below, after taking testimony, determined that the evidence raised substantial questions of fact which should be submitted to a jury and at that time framed two questions of fact for submission to the jury: (1) was the decedent, Agnes O. Duncan, on November 29, 1950, at the time she signed the disputed writing, of sound mind, memory and understanding? and (2) was the disputed writing, dated November 29, 1950, and signed by the decedent, Agnes O. Duncan, procured by undue influence? Donald H. Kerr, the will's proponent, was designated plaintiff and Clarence F. O'Donovan, the contestant, was designated defendant in the framed issues.

A trial of these issues before the court and a jury was concluded on November 2, 1953, at which time the court below directed a verdict for plaintiff on the issue of undue influence and the jury disagreed on the issue of testamentary capacity. The plaintiff's motion for a judgment on the record was dismissed on July 28, 1954, and the cause directed to be resubmitted to another jury.

---

[1] Of the three witnesses to this alleged will: (1) F. E. Holahan, proponent's half-brother, would be an heir if will was invalid; (2) Eleanor E. Roland is a step-niece of testatrix whose half-sister would take if will was invalid, and (3) Eva Pfrogner was a hospital patient.

In October, 1955, a new trial was held before a court and jury, and the court below withdrew the issue of undue influence from the jury's consideration and submitted to the jury the issue only as to testamentary capacity. The jury returned a verdict sustaining the will on the ground of testamentary capacity.

The contestant then filed fourteen separate reasons for a new trial: the first reason alleged error in withdrawing the issue of undue influence from the jury; the second reason alleged that the court erred in refusing to admit the inventory and appraisement of decedent's husband's estate into evidence; reasons three to fourteen, inclusive, alleged errors in the court's charge to the jury.

On May 29, 1956, the court below ruled there was no substantial dispute of fact as to undue influence, that that issue had been properly withdrawn from the jury, approved the jury verdict finding decedent possessed testamentary capacity when she executed the disputed will and dismissed defendant's motion for a new trial. From that action this appeal was taken.

A resolution of the first question raised by this appeal involves an examination of the record to determine whether the evidence as to undue influence was substantial in nature so as to require its submission to a jury. In resolving this question we apply the following test or criterion: if this issue of fact were submitted to a jury and the jury returned a verdict either for proponent or for contestant, would either verdict have to be set aside because it was contrary to the weight of the evidence? If after an analysis of the entire evidence as a whole, we answer this question in the negative, then the dispute is substantial; if the answer is in the affirmative, then the dispute is not substantial.

The late Mr. Justice ALLEN M. STEARNE, in a concurring opinion in *Lare Will*, 352 Pa. 323, 331, 332, 42 A. 2d 801, stated: "The case of DeLaurentiis's Estate, 323 Pa. 70, 186 A. 359, is perhaps the latest leading authority upon the subject now under consideration. Mr. Justice HORACE STERN has concisely and accurately defined the function of an orphans' court judge sitting to determine whether a substantial dispute exists: '. . . the judge of the orphans' court conducting the hearing is not to constitute himself the jury, that is, to decide the case as he would if acting in the capacity of an ultimate fact-finding tribunal. His function is to decide whether there is a substantial dispute upon a material matter of fact, and such a dispute exists if a verdict that might be reached by a jury, even if at variance with his own opinion, would not have to be set aside as judicially untenable because contrary to the weight of the evidence. . . .' We have repeatedly reaffirmed this principle: Kline's Estate, 322 Pa. 374, 378, 186 A. 364; Hunter's Estate, 328 Pa. 484, 492, 196 A. 35; Noble's Estate, 338 Pa. 490, 492, 13 A. 2d 422; Porter's Estate, 341 Pa. 476, 482, 19 A. 2d 731; De Silver, Admrs., v. Pa. Trust Co., 342 Pa. 320, 322, 20 A. 2d 761; Young Estate, 347 Pa. 457, 459, 32 A. 2d 901; see also Patti's Estate, 133 Pa. Superior Ct. 81, 83, 1 A. 2d 791." See also: *Sturgeon Will*, 357 Pa. 75, 76, 81, 53 A. 2d 139; *Higbee Will*, 365 Pa. 381, 383, 75 A. 2d 599; *Molden Will*, 387 Pa. 484, 500, 501, 128 A. 2d 568.

The nature and scope of the lower court's duty has been defined in *O'Malley Will*, 370 Pa. 281, 284, 285, 88 A. 2d 69, wherein it was said: "The learned hearing judge accurately expressed the nature and scope of the duty of a hearing judge in the orphans' court upon an application for an issue *devisavit vel non*. He said: 'The duty of the hearing judge now is to

determine whether the evidence discloses the existence of a substantial dispute of material fact relative to any of the further questions involved (Lare Will, 352 Pa. 323; Lewis Will, 364 Pa. 225). If it does, he must on timely request, award an issue or issues for trial by a jury (DeLaurentiis' Estate, 323 Pa. 70) and may do so of his own motion (Cross's Estate, 278 Pa. 170). . . .

" 'Although limited to the single inquiry as to whether the evidence discloses the existence of a substantial dispute and mandated not to constitute himself the trier of facts, nevertheless, the hearing judge must weigh and consider all the evidence in order to ascertain if the dispute be substantial (Lare Will, supra, p. 336). Mere conflict in the testimony is not enough (Guarantee Trust & Safe Deposit Company v. Heidenreich, 290 Pa. 249, 251). As seen in Higbee Will, 365 Pa. 381, 383, "there can be no substantial dispute where a verdict of a jury . . . would have to be set aside as against the weight of the evidence." Finally, the evidence must be "of the probative value required by our decisions" (Cross's Estate, supra, p. 185) as well as "credible and trustworthy" (DeLaurentiis' Estate, supra, p. 77).' " See also: *May v. Fidelity Trust Co.,* 375 Pa. 135, 99 A. 2d 880.

The contestant urges that the will was brought about by undue influence exerted upon the decedent by Donald H. Kerr, the proponent. Donald H. Kerr, the sole beneficiary and executor under the will, was a nephew of the decedent, and, from the age of approximately two years until he was old enough to attend third grade—a period of approximately seven years—he made his home with the decedent; thereafter he spent approximately six years with his mother and stepfather in New York; he then returned to decedent and made his home with decedent and her father

until 1930, and from that time until the death of decedent—with the exception of about two years—he made his home with the decedent and her husband. For practical purposes the relationship between decedent and Donald Kerr was akin to that of mother and son, and the record is replete with instances of continuous references to the close relationship between decedent and Donald Kerr. Prior to November 27, 1950, the decedent and her husband were partners in a profitable coal and coke venture, and Donald H. Kerr had worked for them in this venture for approximately twenty years. From this background and from the fact that he became the sole beneficiary and executor under decedent's will, it is urged that a confidential relationship has been established under the evidence.

Proponent offered evidence of the probate of the alleged will by the Register. The "duty to come forward with evidence" thus shifted to contestant: *Keen's Estate*, 299 Pa. 430, 149 A. 737; *Plotts' Estate*, 335 Pa. 81, 5 A. 2d 901; *Szmahl's Estate*, 335 Pa. 89, 6 A. 2d 267; *Simon Will*, 381 Pa. 284, 292, 113 A. 2d 266. See also: *Williams v. McCarroll*, 374 Pa. 281, 292, 97 A. 2d 14.

In *Shook v. Bergstrasser et ux.*, 356 Pa. 167, 171, 51 A. 2d 681, we quoted the following language from *Hamberg v. Barsky et al.*, 355 Pa. 462, 50 A. 2d 345: " ' "Confidential relation is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed; in both an unfair advantage is possible. . . . No precise language can define the

limits of the relation or fetter the power of the court to control these conditions. . . . In some cases the confidential relation is a conclusion of law, in others, it is a question of fact to be established by the evidence": Leedom v. Palmer, 274 Pa. 22, 25, 117 A. 410, 411, 412; Null's Estate, 302 Pa. 64, 68, 153 A. 137, 139; McCown v. Fraser, 327 Pa. 561, 564, 565, 192 A. 674, 676; Ringer v. Finfrock, 340 Pa. 458, 461, 462, 17 A. 2d 348, 350.' " See also *Kees, Exr., v. Green,* 365 Pa. 368, 374, 75 A. 2d 602; *Williams v. McCarroll,* 374 Pa., supra, 294, 295.

Upon what does contestant rely to establish, at least prima facie, that the proponent occupied a confidential relationship towards decedent? Contestant relies on the following facts: (1) that proponent was a nephew of decedent and long associated in residence with her, (2) that proponent for a long time managed the mine of decedent and her husband and continued to operate the mine after the husband's death and until the death of decedent and (3) that proponent secured from decedent a renunciation of her right to act as personal representative of her husband's estate so that proponent could act. The fact of kinship between proponent and decedent does not alone establish a confidential relation. In *Stewart v. Hooks,* 372 Pa. 542, 550, 94 A. 2d 756, it was said: "In reviewing will contests we have frequently decided that persons in close family relationship enjoyed no confidential relation. See: Leedom v. Palmer, 274 Pa. 22, 117 A. 410 (brother and sister); Aggas v. Munnell, 302 Pa. 78, 152 A. 840 (father and daughter); Cookson's Estate, 325 Pa. 81, 188 A. 904 (mother and daughter); Royer's Estate, 339 Pa. 423, 12 A. 2d 923 (mother and son); Cressman Estate, 346 Pa. 400, 31 A. 2d 109 (husband and wife)". See also: *Farmer Will,* 385 Pa. 486, 491, 123 A. 2d 630. The fact that proponent performed business services

for decedent does not establish a confidential relationship: *Wetzel v. Edwards,* 340 Pa. 121, 124, 16 A. 2d 441. In *Llewellyn's Estate,* 296 Pa. 74, 145 A. 810, the fact that the proponent drew checks, paid bills and lived in the same room with decedent to take care of him did not prove a confidential relationship. In *King Will,* 369 Pa. 523, 528, 87 A. 2d 469, the court found no confidential relationship between a testatrix and her niece who lived together, even though the niece wrote checks for her aunt, possessed a power of attorney for her safe deposit box and contacted the lawyer who wrote the will. The fact that the proponent did obtain a renunciation from his aunt of her right to act as personal representative of her husband's estate does not, under the circumstances, prove the existence of a confidential relationship. With the husband having died very suddenly and the decedent a very ill woman, it was imperative, if the mine operated by the parties was to remain open, that someone be placed in a position to operate the mine, pay the workmen and attend to the myriad of duties in connection with its operation. To so operate the mine someone had to act for the husband's estate: it was not only natural, but extremely logical, in view of decedent's inability to act because of her hospitalization, that proponent who had managed the mine for many months assume charge in the situation. Under the evidence on this record a confidential relationship has not been established.

The language of Judge RENO in *Boyd Estate,* 168 Pa. Superior Ct. 182, 186, 77 A. 2d 662, is very appropriate: "Absent a confidential relation and present only testator's weakened mentality, the burden of proof did not shift to proponents. . ."

Did the testatrix have a weakened mentality to the extent that she was apt to become the victim of undue influence? In support of its contention that testatrix

626

was of weakened mentality the contestant depended principally on three witnesses: Dr. Pisula, two nurses and the hospital records. Dr. Pisula testified that he was decedent's physician from approximately 1946 or 1947 until her death, and that during this period of time she was suffering from a heart disease accompanied by dropsy, swelling, and the hardening of her arteries. On occasion she had been hospitalized in the Cleveland Clinic and the Mercy Hospital of Pittsburgh and on November 27th she was admitted to the Mt. Pleasant Hospital, Fayette County. As she was taken to the hospital decedent was desperately ill, and on the morning of November 28th when the doctor saw her, her condition was serious and critical. He described her as: "Not nearly as alert as she had been in the early part of her illness"; "a bit foggy and confused"; "difficult to obtain answers from her". However, she would recognize him when he would speak to her. The hospital records indicate that the decedent was "confused", although "composed", on November 29th. On November 27, 28 and 29, she was on the critical list and could have died any moment. At this time morphine was being given the decedent, although the records show that from 9:00 P.M. on November 28 until 9:00 P.M. on November 29 she had but one hypodermic of morphine. The purpose of the morphine was to quiet her down and help increase the fogginess or confusion of her mental processes. In Dr. Pisula's opinion, decedent, on November 29, 1950, did not have the mental capacity to comprehend her possessions, the objects of her bounty, or what disposition she wanted to make of her possessions, and would not have been able to resist persuasion and/or pressure of relatives or friends, although she would give the appearance of comprehending and thinking normally.

Mrs. Grabiak, a registered nurse, attended decedent from November 27, 1950, to December 22, 1950. She described decedent's condition as serious during the whole period of hospitalization, the difficulty in administering sedatives, her periods of confusion during the evening hours, and stated that in her opinion decedent did not have the mental capacity to make a will. Her testimony was corroborated by another registered nurse, Edna Loucks. It does not seem to be disputed that decedent at the time of the execution of the will was a seriously ill person.

Assuming, arguendo, that this testimony established a weakened intellect, the burden of proving undue influence still rested upon contestant, in the absence of proof that a confidential relationship existed between decedent and proponent. Did the contestant sustain the burden of proving sufficient facts to require the court to submit the question of undue influence to the jury?

In *Quein Will*, 361 Pa. 133, 145, 146, 62 A. 2d 909, the burden of proof of undue influence and the quantum of evidence necessary to carry that burden is well stated: "There is a *presumption* of the *absence* of undue influence. The *initial* burden of proof is on contestant: Cressman Estate, 346 Pa. 400, 31 A. 2d 109; Ross Will, 355 Pa. 112, 49 A. 2d 392. Where there is no evidence of *weakened intellect* the burden is upon those asserting undue influence to prove it even though the bulk of the estate is left to those occupying a *confidential* relation: Ash Will, supra, and the cases therein cited. But where there is evidence of *confidential* relation coupled with a *weakened mind,* the burden of proof shifts to proponents. Such evidence, however, need not be sufficient to establish *testamentary incapacity*. All the evidence need show is bodily infirmity and weakened mentality. Where the evidence shows

bodily infirmity and greatly weakened mentality, and a stranger to the blood of the testator, standing in a confidential relation, is benefited by the will which he has been instrumental in having executed, a *presumption* of undue influence arises: Adam's Estate, 220 Pa. 531, 69 A. 989; Phillips' Estate, 244 Pa. 35, 90 A. 457; Schwartz's Estate, 340 Pa. 170, 16 A. 2d 374; Hollinger Will, 351 Pa. 364, 41 A. 2d 554. Conjecture and suspicion do not take the place of testimony: Royer's Estate, supra; Rosenthal's Estate, 339 Pa. 488, 496, 15 A. 2d 370; Shuey et al., Exrs. v. Shuey et al., supra; Porter's Estate, 341 Pa. 476, 19 A. 2d 731; Ash Will, supra. *But undue influence may be established by circumstantial evidence*: Boyd v. Boyd, 66 Pa. 283; W. H. Herster et al. v. A. J. Herster et al., 116 Pa. 612, 11 A. 410; Reichenbach v. Ruddach, 127 Pa. 564, 18 A. 432. Undue influence is so intangible and illusive that it can be rarely proven by personal observation, i.e., by testimonial or direct evidence. . ."

Undue influence was defined in *Quein Will*, supra, p. 145, as follows: "This Court has repeatedly defined undue influence sufficient to void a will. There must be imprisonment of the body or mind, frauds or threats or misrepresentations, or circumstances of inordinate flattery, or physical or moral coercion to such a degree as to prejudice the mind of the testator, or destroy his free agency, or to operate as a present restraint upon him in the making of the will: Keen's Estate, 299 Pa. 430, 149 A. 737; Cookson's Estate, 325 Pa. 81, 188 A. 904; Buhan, Exr., et al. v. Keslar et al., 328 Pa. 312, 194 A. 917; Olshefski's Estate, 337 Pa. 420, 11 A. 2d 487; Royer's Estate, 339 Pa. 423, 12 A. 2d 923; Shuey et al., Exrs., v. Shuey et al., 340 Pa. 27, 16 A. 2d 4; Wetzel v. Edwards, 340 Pa. 121, 16 A. 2d 441; Ash Will, 351 Pa. 317, 41 A. 2d 620."

A careful examination of the instant record discloses a complete lack of sufficient evidence—merely suspicion—that any undue influence was exerted by proponent on the decedent. The record does not indicate any "imprisonment of the body or mind, . . . inordinate flattery, or physical or moral coercion . . . to prejudice the mind . . . or destroy his free agency" of testatrix so as to operate as a restraint on her: *Ash Will*, 351 Pa. 317, 41 A. 2d 620; *Gracey v. Rutherford*, 366 Pa. 196, 199, 77 A. 2d 358; *Williams v. McCarroll*, 374 Pa., supra, 294, 295.

Where testamentary capacity has been established—as here—by the jury's verdict, the evidence to set aside a will on the ground of undue influence must be clear and strong: *Hook's Estate*, 207 Pa. 203, 56 A. 428; *Royer's Estate*, 339 Pa., supra; *Shuey et al., Exrs., v. Shuey et al.*, 340 Pa. 27, 30, 16 A. 2d 4. The instant evidence lacks not only clarity and strength: it is little short of mere suspicion and conjecture.

In reviewing the chancellor's refusal to submit the question of undue influence to a jury, the question for us to decide is not whether we would have reached the same result had we been acting as chancellor, but rather, whether a judicial mind, on due consideration of the evidence as a whole, could reasonably have reached the chancellor's conclusion. "In other words, the chancellor's decision will not be reversed unless an abuse of discretion on his part appears": *Dible's Estate*, 316 Pa. 553, 554, 175 A. 538; *DeLaurentiis's Estate*, 323 Pa., supra, 70, 77, 78 (cases therein cited); *Franz Will*, 368 Pa. 618, 623, 84 A. 2d 292; *Johnson Will*, 370 Pa. 125, 130, 87 A. 2d 188.

A review of this record reveals no abuse of discretion on the part of the court below in withdrawing the issue of undue influence from the jury.

The contestant next urges that the court erred in refusing to grant a new trial on the issue of testamentary capacity. In contestant's statement of the questions involved in this appeal four questions are posed: two questions deal with the issue of undue influence, (which have already been considered), and two questions deal with the issue of testamentary capacity, which must now be considered. On the issue of testamentary capacity, contestant urges (1) that the testimony of a priest, present at the time of execution of the will, raised an issue of fraud and (2) that the trial judge erred in refusing to charge on the relevancy of certain alleged testamentary desires uttered by testatrix immediately subsequent to the execution of the will. An examination of contestant's brief indicates that contestant argues that the court below also erred in refusing to admit into evidence an inventory or appraisement of decedent's husband's estate and that the court's charge was inadequate on the subject of the credibility of witnesses. The latter arguments relate to questions which are not presented in the statement of questions involved, and, therefore will not be considered on this appeal: Rule 35, Rules of the Supreme Court of Pennsylvania; *Burke Appeal*, 378 Pa. 616, 108 A. 2d 58; *Blue Anchor Overall Co. v. Pa. Lumbermens Mut. Ins. Co.*, 385 Pa. 394, 402, 123 A. 2d 413.

Father Donnerbauer, present when the will was executed, testified, inter alia: "Q. . . . Did you hear a discussion at the bedside between Donald Kerr, Mr. Francis Eugene Holahan and Mrs. Duncan? A. What kind of a conversation do you mean? They were talking about a will. Q. Did you hear a conversation in which the words 'temporary arrangements' were used? A. Well he may have said that. Q. To your best recollection? A. I think so. . . . A. Well he (Donald Kerr) asked her (decedent) if she understood what this was about

and she said she did. He said it would be a temporary arrangement until things would be settled. She said it is all right the way it is. She said, 'I understand'. Q. Who said it was a 'temporary arrangement'? A. Don, I think, said that. Q. Donald Kerr. Did you hear any discussion at that time? A. This was supposed to be about the administration of the mine. Q. Is that the discussion that was going on? A. That was what it was. Q. Did you hear what was being discussed about running the mine? A. He wanted the ability to pay the checks, to pay the men there." (Emphasis supplied)

Father Donnerbauer had previously testified that he conversed with decedent, saw decedent read and sign the will, saw the other persons sign as witnesses and that decedent seemed to know what was going on. There was additional testimony from other witnesses to the effect that on the same day the decedent signed the renunciation in connection with her deceased husband's estate. The court charged on this subject: "An effort was made through the testimony of Father Donnerbauer to show misrepresentation when he testified that Donald H. Kerr said something about a paper being only a temporary matter. But there is evidence in the case that the renunciation was signed about that time and that the remark was directed to that paper". A reading of this portion of the charge indicates that Father Donnerbauer's testimony was to be considered by the jury together with the testimony concerning the renunciation. The jury was left free to determine whether this remark of proponent, if made, referred to the will or to the renunciation. Contestant urges that a fraud was practised upon decedent by proponent's representation that the will was to be temporary in nature. In the court's charge it was made clear that the jury were to determine, under Father Donner-

bauer's testimony, whether decedent knew what she was doing: by the jury's verdict it has been established that decedent did know what she was doing when she made the will. Furthermore, the evidence of Father Donnerbauer in this respect would relate not to the issue of testamentary capacity but rather of testamentary intent,—an issue not raised. We find no error on the part of the court below in its handling of this situation.

Miss Roland, a subscribing witness, testified that she talked to decedent and asked her if she had made the will according to her wishes. The decedent replied that "she had, that Don would take care of things as she wished and she also made some verbal requests, one thing which I had heard many times before from her was, that a diamond brooch should be left to Mary Roland, my sister, and on this occasion she mentioned that bequest and also said that Bill O'Donovan, her nephew, should be sent to college."

The court in its charge stated that this testimony was presented to show undue influence and that such declarations must be corroborated by proof of other facts or circumstances indicating a circumvention or fraud in the procurement of the will. The court then stated that such other corroborative facts and circumstances were lacking. Such instructions were in accordance with existing law: See *Keen's Estate,* 299 Pa. 430, 439, 149 A. 737; *Cookson's Est.,* 325 Pa. 81, 188 A. 904; *Buhan v. Keslar,* 328 Pa. 312, 316, 317, 194 A. 917.

Furthermore, since the decedent lived for over a month subsequent to execution of the will and had adequate opportunity to revoke the will, had she so desired, such declarations do not establish influence. An analysis of the testimony in this respect indicates that decedent expressed to Miss Roland her satisfaction with

the will and her belief that proponent would take care of certain things that she desired to be done. Miss Roland's testimony concerning these declarations of the testatrix not only confirms decedent's capacity to make a will but decedent's understanding of that which the will contained for she was trusting proponent to perform certain acts not mentioned in the will.

The contestant submitted two points for charge on this subject which the court below properly refused. Had these points been affirmed the jury would have been improperly instructed. We find no error in this respect.

We have examined carefully the entire charge of the court below and are convinced that it was free of harmful error. An examination of the charge as a whole indicates that in a fair and impartial manner the learned court below adequately covered both the testimony and the law applicable to the subject of testamentary capacity. The jury having found, under sufficient and adequate instructions, that the decedent on November 29, 1950, possessed testamentary capacity, great weight should be given to their verdict. Particularly is this so when the trial court who had the opportunity of observing the witnesses confirms the verdict as proper and fair under the circumstances.

It has long been established that a decedent possesses testamentary capacity if he or she has knowledge of those that are the natural objects of his or her bounty, of generally what his or her estate consists, and generally what he or she wants done with it, even though his or her memory may be impaired by age or disease. *Sturgeon Will,* 357 Pa., supra, 75, 81, 53 A. 2d 139; *Ash Will,* 351 Pa., supra, 321, 322, 41 A. 2d 620; *Olshefski's Estate,* 337 Pa. 420, 423, 11 A. 2d 487.

Old age (*Franz Will,* 368 Pa., supra, 84 A. 2d 292; *Higbee Will,* 365 Pa., supra, 75 A. 2d 599; *Ross Will,*

355 Pa. 112, 49 A. 2d 392), failure of memory (*Conway Will*, 366 Pa. 641, 79 A. 2d 208; *Ross Will*, 355 Pa. 112, 49 A. 2d 392; *Olshefski's Estate*, 337 Pa., supra, 11 A. 2d 487), infirmities of advancing years (*Wetzel v. Edwards*, 340 Pa., supra, 16 A. 2d 441), physical weakness (*Dugacki Will*, 356 Pa. 143, 51 A. 2d 627; *Lauer Will*, 351 Pa. 438, 41 A. 2d 552; *Thomas Will*, 349 Pa. 212, 36 A. 2d 819; *Schwartz's Estate*, 340 Pa. 170, 16 A. 2d 374), and mere delusions (*Duncan's Will*, 147 Pa. Superior Ct. 133, 23 A. 2d 357) do not amount to testamentary incapacity.

Testamentary capacity is presumed. After proof of the execution of this will by two witnesses, the burden of proof as to testamentary incapacity rested upon the contestant (*Sturgeon Will*, 357 Pa., supra, 81, 82). This burden the jury has found was not sustained.

An examination of the entire record convinces us that this case was properly and fairly presented and that the result reached was eminently proper under the circumstances.

Appellant has not questioned the sufficiency of the evidence to sustain the finding of the jury that the decedent at the time she executed the will possessed testamentary capacity. While the contestant presented substantial evidence on the part of the attending physician and two nurses indicating that decedent did not have testamentary capacity, yet proponent's evidence was also substantial. Two subscribing witnesses—one entirely disinterested and the other having an interest opposed to the will's validity—and a priest testified that they were present at the time decedent executed the will and that she then possessed testamentary capacity; other witnesses who saw and talked with decedent within a comparatively short time prior to and subsequent to the date of execution of the will stated that in their opinion decedent had testamentary ca-

pacity; after the date of execution of the will decedent was able to attend her husband's wake at the funeral home, although she did not attend the funeral service; the will was kept after its execution by a person whose interests would be normally adverse to the provisions of the will, etc. The evidence on both sides was of such a nature that a finding of the jury either of testamentary capacity or lack of testamentary capacity could have been sustained. The dispute of fact on the subject of testamentary capacity was so substantial in nature that it was necessary for a jury to pass upon the evidence. Our province is not to decide whether we would have reached the same result as did the jury but rather to determine whether, on due consideration of all the evidence, the jury, whose verdict satisfied the legal conscience of the Chancellor, could reasonably have reached the conclusion which it did. The determination of the question of testamentary capacity was clearly within the province of the jury and its finding was based upon sufficient and adequate evidence.

Decree affirmed. Costs are placed on the appellant.